**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

STERILITE CORPORATION,            )
                                  )
         Plaintiff,               )
                                  )
v.                                )        No. 1:22-cv-10327-JEK
                                  )
OLIVET INTERNATIONAL, INC.,       )
                                  )
         Defendant.               )
_____)

### MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DEFENDANT'S MOTION TO EXCLUDE THREE EXPERT OPINIONS, AND PLAINTIFF'S MOTION TO EXCLUDE CERTAIN PORTIONS OF THREE EXPERT OPINIONS

**KOBICK, J.**

This is a trade dress case brought by plaintiff Sterilite Corporation, a manufacturer of injection-molded plastic houseware products, against defendant Olivet International, Inc., a distributor of plastic consumer goods. A product's trade dress is its "'design and appearance,'" together with "'the elements making up the overall image that serves to identify the product presented to the consumer.'" *Yankee Candle Co. Inc. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 37-38 (1st Cir. 2001) (quoting *Chrysler Corp. v. Silva*, 118 F.3d 56, 58 (1st Cir. 1997)). Sterilite alleges that Olivet intentionally copied its cabinets, drawers, and wastebasket lids and then sold those products to one of Sterilite's biggest customers, Walmart. The complaint asserts claims for trade dress infringement under the Lanham Act, 15 U.S.C. § 1125(a); dilution pursuant to M.G.L. c. 110H, § 13; common law unfair competition; and tortious interference with business relationships. Following discovery, Olivet has moved for summary judgment and to exclude the

1

opinions of three of Sterilite's experts. Sterilite has also moved to exclude certain portions of Olivet's three expert opinions.

Olivet's summary judgment motion will be granted as to the Lanham Act, dilution, and unfair competition claims regarding Sterilite's wastebasket lids, but denied as to those claims regarding Sterilite's cabinets and drawers. Drawing inferences in favor of Sterilite, a reasonable trier of fact could conclude that Sterilite's cabinets and drawers are entitled to trade dress protection as both distinctive and non-functional. On this record, however, a reasonable trier of fact could not conclude that Sterilite's wastebasket lids are distinctive. Olivet's summary judgment motion will also be denied with respect to the tortious interference claim, because a reasonable jury could conclude that Sterilite had a business relationship with Walmart, Olivet intentionally and improperly interfered with that relationship, and Sterilite was harmed as a result.

Olivet's motion to exclude Sterilite's expert evidence will be denied in its entirety. Sterilite's motion to exclude will be granted with respect to testimony from Olivet's damages expert, Juli Saitz, about the cause of Sterilite's damages, and testimony from Olivet's design expert, Paul Hatch, about the functionality of Sterilite's overall trade dress. Sterilite's motion to exclude will otherwise be denied.

## BACKGROUND

The following facts, unless otherwise noted, are either undisputed or recounted in the light most favorable to Sterilite, the non-moving party. *See Kinzer v. Whole Foods Mkt., Inc.*, 99 F.4th 105, 108 (1st Cir. 2024).[1]

---

[1] Sterilite contends that Olivet's 41-page statement of material facts should be stricken as "a blatant end-run around the Court's memoranda page limits." ECF 114, at 3 n.4. This "request to strike is procedurally improper" because, under Local Rule 7.1, Sterilite "was required to file a separate motion to strike" rather than "bur[y] [its] argument in a single footnote in [its] opposition to [Olivet's] motion for summary judgment." *Schuster v. Wynn Resorts Holdings, LLC*, No. 19-

I.      **The Parties.**

Sterilite manufactures plastic consumer products, including the five at issue in this case: its (i) 2-shelf storage cabinet, (ii) 4-shelf storage cabinet, (iii) 4-drawer storage unit, (iv) 11-gallon wastebasket lid, and (v) 13-gallon wastebasket lid. ECF 115, ¶¶ 2, 38. Sterilite claims that it has protectible unregistered trade dress for each of these products, including, among other features discussed below, inset side panels, tapering handles, and curved and inset doors. *Id.* ¶¶ 2, 41. Since 2011, Sterilite has extensively advertised and promoted the trade dress of those products in print, within stores, through search engine optimization, and across social media platforms like Facebook, Instagram, and X (formerly known as Twitter). *Id.* ¶ 86. Sterilite's advertising includes its purchase of fifteen advertisements in HomeWorld Business, a trade magazine, as well as accrual advertising, involving the purchase of ads from a retailer based on a percentage of the sales revenue from Sterilite's products. *Id.* ¶¶ 87, 98-101.

Olivet distributes consumer products in the United States, including plastic goods. *Id.* ¶ 43. As relevant here, Olivet sells plastic products to Walmart, a large national retailer of consumer products. *Id.* ¶¶ 44, 48. Since September 2021, Olivet has sold its (i) 2-shelf storage cabinet, (ii) 4-shelf storage cabinet, and (iii) 4-drawer storage unit to Walmart, for resale under Walmart's private label brand name "Hyper-Tough." *Id.* ¶¶ 44, 46, 333. Similarly, since December 2021, Olivet has sold its (iv) 11-gallon and (v) 13-gallon wastebaskets with lids to Walmart under the brand name

---

cv-11679-ADB, 2023 WL 2248886, at *4 (D. Mass. Feb. 27, 2023) (collecting cases). In any event, as Olivet points out, the cases cited by Sterilite merely support disregarding the legal conclusions contained in the statement of material facts, not striking those facts altogether. *See, e.g.*, *Reich v. U.S. Dept. of Energy*, 811 F. Supp. 2d 542, 544 (D. Mass. 2011) ("[T]he Court will deny defendants' motion to strike but declines to consider any improper legal argument made in plaintiff's Statement of Facts.").

"Mainstays." *Id.* ¶¶ 44, 47. Walmart owns the Mainstays brand and sells products under this brand that are either manufactured for, or distributed to, it by suppliers like Olivet. *Id.* ¶ 45.

Sterilite claims that Olivet has infringed on Sterilite's trade dress by selling replicas of its cabinets, drawers, and wastebaskets to its "important customer," Walmart. *Id.* ¶¶ 2, 252. In the spring of 2020, the COVID-19 pandemic disrupted the supply chain and affected Sterilite's ability to keep up with demand. *Id.* ¶ 260; ECF 135, at 6:8-13. Walmart, in turn, identified issues with some of Sterilite's products, but Sterilite contends that those issues merely served as "pretext for buying cheaper copies of [its] products." ECF 115, ¶ 307. Walmart had indicated that it would buy from Olivet only if Olivet copied Sterilite's designs of the five products at issue. *See, e.g.*, *id.* ¶ 332; ECF 110, at 19. After it lined up Olivet as a supplier, and once Olivet was ready to execute, Walmart discontinued Sterilite's products. ECF 115, ¶ 307. The components of Sterilite's and Olivet's products are interchangeable. *Id.* ¶ 331.

## II.     <u>Sterilite's Cabinets.</u>

Sterilite began selling its 2-shelf and 4-shelf storage cabinets in 1998. *Id.* ¶¶ 78-79. Sterilite's claimed trade dress for those cabinets consists of "(1) rectangular handles that taper in width from the top center of the unit to the side of the unit; (2) doors that have a curved inset profile; (3) side panels with their own inset profile; and (4) back panels with a geometric inset pattern, along with the shape and appearance of the product[s] as a whole." *Id.* ¶ 41(a). As of late February 2024, through images and a video, Walmart's website displayed all of the trade dress elements claimed for the cabinets. *Id.* ¶ 119.

In September 2016, a HomeWorld advertisement featured the front panel of the 4-shelf cabinet. *Id.* ¶¶ 91, 340. The front and side panels of the 4-shelf cabinet were also featured in HomeWorld ads from April 2014, October 2014, and April 2015. *Id.* ¶¶ 92, 341. In April 2013,

HomeWorld displayed the front, side, and inside panels of the 4-shelf cabinet. *Id.* ¶¶ 94, 342. This cabinet was also shown in two Facebook posts in 2018 and one in 2017. *Id.* ¶ 107. In addition, it was featured in two Instagram posts, one in 2018 and the other in 2016, and posted on X once in 2018. *Id.* ¶¶ 110, 113.

Similarly, in April 2011, HomeWorld displayed the front, side, and inside panels of the 2-shelf cabinet. *Id.* ¶ 95. Another advertisement in May 2012 featured the cabinet's front, side, top, and inside panels. *Id.* ¶ 96. A September 2016 HomeWorld ad showed both the front and top panels of this cabinet. *Id.* ¶ 91. The cabinet also appeared in a 2016 Instagram post. *Id.* ¶ 110.

Customers who purchased Olivet's Hyper-Tough cabinets have expressed confusion about whether they were made by Sterilite. *Id.* ¶ 347. In October 2022, for example, a review by "DBone" stated: "I have few of the more expensive garage storage solutions in my garage as you can see in the picture, so I have a pretty good idea what to expect from these things. This Hyper-Tough cabinet is MUCH cheaper feeling that [sic] those." *Id.* ¶ 128. A customer named "Minco" wrote a similar review in May 2022, explaining: "The plastic molding it's made of is badly warped. It was easy for me to put together because I bought two when they were made by sterilite last year. The ones from sterilite work fantastic. These are horribly warped and I had to use a lock, not to keep the cabinet locked, but to keep the doors closed." *Id.* ¶ 132. And in March 2022, a customer wrote that she "purchased 2 of these in 2020, and they were great," but that "[t]hese units were warped out of the box and extremely difficult to assembl[e]." *Id.* ¶ 351.

III. **Sterilite's Drawers.**

Sterilite started selling its 4-drawer storage unit in 2002. *Id.* ¶ 80. Sterilite's asserted trade dress for the drawers consists of "(1) top and bottom panels that have outward curved leading edges; (2) handles that have downward curved leading edges; and (3) drawers that have curved

front faces, along with the shape and appearance of the product as a whole." *Id.* ¶ 41(b). As of late February 2024, all three elements could be seen in the images on Walmart's website, which included a three-dimensional view. *Id.* ¶ 119. The front, top, and side panels of the drawers appeared in HomeWorld ads in April 2011, November 2013, May 2016, April 2017, April 2018, January 2019, and January 2020. *Id.* ¶¶ 90, 93, 95, 97, 343, 345. The front and top panels of the drawers were featured in HomeWorld ads from September 2016 and April 2013. *Id.* ¶¶ 91, 94, 344.

Sterilite's drawers also appeared in three Facebook posts: one in 2022 and two in 2018. *Id.* ¶ 107. They were shown in five Instagram posts: two in 2022, two in 2018, and one in 2016. *Id.* ¶ 110. Sterilite posted the drawers on X twice in 2022 and twice in 2018. *Id.* ¶ 113. In 2022, Sterilite posted a photo of the drawers across all three social media platforms and highlighted the "heavy-duty, sleek drawer unit." *Id.* ¶ 116.

## IV.    **Sterilite's Wastebasket Lids.**

Sterilite has sold its 11-gallon wastebasket lid since 2011 and its 13-gallon wastebasket lid since 2003. *Id.* ¶ 81. For the 11-gallon lid, Sterilite's claimed trade dress consists of "(1) an asymmetrically sloped top with a curved swing top door; (2) door handles that have a curved inset profile; and (3) a unique attachment mechanism and rib configuration on the underside of the sloped lid." *Id.* ¶ 41(c). Similarly, for the 13-gallon lid, its alleged trade dress consists of "(1) a swing top with rounded back corners and more dramatically rounded front corners; (2) door handles that have a curved inset profile; and (3) a unique rib configuration on the underside of the sloped lid." *Id.* ¶ 41(d). As of late February 2024, the images on Walmart's website did not show the rib configuration of either lid. *Id.* ¶ 119. While the 13-gallon lid has not appeared in any

HomeWorld advertisements, Sterilite's 11-gallon lid was featured in ads from February 2012, March 2012, and November 2013. *Id.* ¶¶ 88-89.

## V.    **Procedural History.**

Sterilite brought this action against Olivet in March 2022. ECF 1. The complaint—which, for those interested, includes pictures of each of Sterilite's products and claimed trade dress, as well as of Olivet's products—asserts claims against Olivet for unfair competition, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count I); unfair competition, in violation of M.G.L. c. 93A, § 11 (Count II); dilution, in violation of M.G.L. c. 110H, § 13 (Count III); common law unfair competition (Count IV); and tortious interference with business relationships (Count V). ECF 1, ¶¶ 47-76.[2] The Court denied Olivet's motion to dismiss the complaint for failure to state a claim in July 2022. ECF 22. After completing discovery, Olivet filed its motion for summary judgment, and the parties filed their respective motions to exclude expert evidence. *See* ECF 102, 106, 109.

## MOTIONS TO EXCLUDE EXPERT EVIDENCE

## I.    **Standard of Review.**

The Court begins with the parties' motions to exclude expert evidence. Federal Rule of Evidence 702, which governs the admissibility of expert opinion evidence, provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

---

[2] Sterilite confirmed at the March 13, 2024 hearing that its claim under M.G.L. c. 93A, § 11 has been withdrawn. ECF 103, at 1 n.1; ECF 135, at 30:9-11.

     (c)  the testimony is the product of reliable principles and methods; and

     (d)  the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Rule was recently amended, effective December 1, 2023, to "emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702, Adv. Comm. Notes 2023 Amendments. The amendments clarify that "the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of" admissibility, not weight. *Id.* The amendments also "emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Id.*

     "In applying Rule 702, a district court must principally determine whether the expert's proffered testimony both rests on a reliable foundation and is relevant to the task at hand." *D'Pergo v. Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, 111 F.4th 125, 140 (1st Cir. 2024) (quotation marks omitted); *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The "'focus' of the inquiry into the admissibility of expert testimony under Rule 702 'must be solely on principles and methodology, not on the conclusions that they generate.'" *Rodríguez v. Hosp. San Cristobal, Inc.*, 91 F.4th 59, 70 (1st Cir. 2024) (quoting *Daubert*, 509 U.S. at 595). This distinction means that "'[w]hen the factual underpinning of an expert's opinion is weak,'—because, for instance, the expert's conclusion is arguably contradicted by aspects of the record—but the expert's methodology itself is sound, that 'is a matter affecting the weight and credibility of the testimony and thus a question to be resolved by the jury.'" *Doucette v. Jacobs*, 106 F.4th 156, 169 (1st Cir. 2024) (quoting *Rodríguez*, 91 F.4th at 70). However, a district court need not, under Rule 702, "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "*Daubert* made clear that to be admissible under Rule 702, an expert's opinion 'must be supported by appropriate validation' and rest on 'more than subjective belief or unsupported speculation.'" *Rodríguez*, 91 F.4th at 70 (quoting *Daubert*, 509 U.S. at 590). A court may thus conclude that an expert's opinion lacks the requisite validation "because, given the record at hand, 'there is simply too great an analytical gap between the data and the opinion proffered.'" *Id.* at 70-71 (quoting *Joiner*, 522 U.S. at 146).

## II.   <u>Olivet's Motion to Exclude Three of Sterilite's Expert Opinions.</u>

Pursuant to Rule 702, Olivet seeks to exclude, in whole or in part, the opinions of three of Sterilite's experts: (1) George O'Shea, Sterilite's household plastics industry expert; (2) David Adriaansen, its product design expert; and (3) Sara Rinke, its damages expert.

### A.   <u>George O'Shea.</u>

Olivet first seeks to exclude the opinions of Sterilite's household plastics industry expert, O'Shea, in their entirety. O'Shea's expert report offers two principal opinions: (1) the trade dress Sterilite claims for its products is distinctive because it "has acquired secondary meaning in the marketplace," and (2) Olivet's products have led to confusion amongst consumers in the marketplace. ECF 105-12, ¶¶ 49-52. Olivet concedes that O'Shea is qualified as an expert to opine on these topics, ECF 122, at 3 & 2 n.3, but contends that his opinions regarding secondary meaning and likelihood of consumer confusion should nevertheless be excluded because he does not analyze the evidence or employ any methodology, *id.* at 1. In Olivet's view, O'Shea's report contains conclusory allegations, lacks evidentiary foundation, and reflects nothing more than "an unreliable 'gut-feeling.'" *Id.* at 3 (quoting *Laber v. Long View R.V., Inc.*, 454 F. Supp. 3d 158, 167 (D. Conn. 2020)).

The Court is not persuaded. As the Supreme Court has observed, "there are many different kinds of experts, and many different kinds of expertise." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). Since O'Shea's testimony does not rest primarily[3] "upon scientific foundations, . . . the relevant reliability concerns may focus upon personal knowledge or experience." *Id.* The inquiry is thus "whether the expert 'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *United States v. Monteiro*, 407 F. Supp. 2d 351, 357 (D. Mass. 2006) (quoting *id.* at 152). O'Shea meets that standard. His experience includes over thirty years in the development, marketing, and sale of household plastic products. ECF 105-12, ¶¶ 7, 11-39. His report draws on those experiences to analyze factors that, according to the First Circuit, bear on whether trade dress has acquired secondary meaning, including the length and manner of Sterilite's use of its trade dress as well as its advertising efforts. *See id.* ¶¶ 43-44, 126-60. He opines, for example, based on his years working at Rubbermaid, that "Sterilite has devoted significant resources over the last two decades toward marketing." *Id.* ¶¶ 15, 148. He explains that "few product designs survive 10, 20 or 25 years in the market, and those that do are able to do so because their designs have become recognized by consumers and thus continue to propel sales." *Id.* ¶ 133. These statements are not, as Olivet urges, conclusory or unreliable. *See DaSilva v. Am. Brands, Inc.*, 845 F.2d 356, 361 (1st Cir. 1988) (admitting testimony of an expert who had 23 years of experience in the relevant field and familiarity with the applicable industry principles). While Olivet may dispute the conclusions of O'Shea's report and criticize his secondary meaning findings as contrary to the survey of Olivet's expert, such competing views must be resolved by a jury at trial. *See Currier v. United*

---

[3] As Sterilite points out, some of the opinions in O'Shea's report are based on empirical research and data analysis. *See, e.g.*, ECF 105-12, ¶¶ 76, 78, 150-51. But the majority of the analysis in his report draws from his experience in the household plastics industry.

*Techs. Corp.*, 393 F.3d 246, 252 (1st Cir. 2004) ("[W]eakness in [an expert's] analysis [is] a matter of weight rather than admissibility and thus properly a subject of argument and jury judgment.").

Olivet also argues that O'Shea's opinions about its copying of Sterilite's products and consumer confusion should be excluded because those issues do not require any specialized knowledge and should be reserved for the jury. But O'Shea's opinions concerning Olivet's alleged copying of Sterilite's products are based on his experience in the plastics industry and could be helpful to the jury in evaluating the norms and practices of that industry. *See Am. Eagle Outfitters, Inc. v. Walmart, Inc.*, No. 20-cv-00412-MJH, 2023 WL 1778750, at *5 (W.D. Pa. Feb. 6, 2023) (denying motion to exclude expert testimony in part because "[s]uch information could assist the jury to reach its conclusion about Walmart's intent in adopting the [disputed] mark"). Drawing on his plastics industry expertise, O'Shea opines, for example, that "[t]he degree and scale of copying that is involved in this case is not common in this industry," and that "[c]opying schemes where knock-off products enter the market at a large scale to entirely replace the original products at a major retailer like Walmart are extremely rare." ECF 105-12, ¶¶ 74-75. O'Shea's opinions regarding consumer confusion are also sufficiently reliable because he has, according to his report, reviewed hundreds of consumer reviews and extensively analyzed six of those reviews. *Id.* ¶¶ 189-93; ECF 117, at 12. His opinion is informed by what he describes as the "iceberg" principle—that is, "for every review in which a customer was confused, there are dozens or hundreds more customers who were also confused and simply lacked the motivation or time to write a review." ECF 105-12, ¶ 194. Olivet's critiques of that principle and O'Shea's opinions, which are rooted in his experience in the field, are properly addressed at trial and resolved by the jury.

B.    David Adriaansen.

Olivet next seeks to exclude the opinions of Sterilite's product design expert, David Adriaansen, as unreliable and unhelpful to the jury because, in Olivet's view, he failed to employ the correct methodology for determining the functionality of Sterilite's trade dress. Adriaansen opines that (1) when analyzed individually and as an overall design, the elements of Sterilite's trade dress are non-functional; (2) alternative products on the market serve the same function as Sterilite's cabinets, drawers, and wastebasket lids, but with different appearances and aesthetics; and (3) Olivet could have chosen different designs for its cabinets, drawers, and wastebasket lids and achieved the same functionality. ECF 105-13, ¶¶ 52-54. Olivet contends that, in reaching these opinions, Adriaansen correctly articulated the "utilitarian functionality test" and the "aesthetic functionality test" drawn from the case law but applied those tests incorrectly.

In general, a product feature is functional "when it is essential to the use or purpose of the device or when it affects the cost or quality of the device." *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 33 (2001). Olivet argues that Adriaansen did not properly assess whether Sterilite's claimed trade dress has utilitarian functionality because he failed to consider whether any of the asserted features "affects cost or quality, serves a function other than source identification, or works better in the designed shape," and instead improperly relied on the existence of alternative designs. ECF 122, at 5. Olivet is correct that a feature is "essential" or functional "where 'the evidence shows that the design provides identifiable utilitarian advantages to the user; i.e., the product or container 'has a particular shape because it works better in [that] shape.'" *SoClean, Inc. v. Sunset Healthcare Sols., Inc.*, 554 F. Supp. 3d 284, 299 (D. Mass. 2021) (quoting *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1274 (Fed. Cir. 2002)), *aff'd*, 52 F.4th 1363 (Fed. Cir. 2022). But, as Olivet recognizes, "whether there are alternative designs that would

12

perform the same function without sacrificing cost or utility" is also relevant in determining if a particular feature is functional. *Id.*; *see* ECF 122, at 5 ("alternative designs are only one factor among many").

Adriaansen reviewed samples of cabinets, wastebaskets, and drawers made by Sterilite, Olivet, and other manufacturers and assessed their design choices. ECF 105-13, ¶¶ 45, 53, 60-61, 65-81, 129-49, 161-78. Based on his review and forty years of experience in industrial design, he concluded that each of the products' individual elements and overall design operated effectively for their intended purpose, and he concluded that only Olivet's products used Sterilite's trade dress. *Id.* ¶¶ 64-81, 96-106, 128-49, 160-84. Since Adriaansen analyzed, among other things, alternative designs, which are relevant to the issue of functionality, Olivet's qualms about his report go to weight, rather than admissibility, and are appropriately addressed at trial. *See McMillan v. Massachusetts Soc'y for Prevention of Cruelty to Animals*, 140 F.3d 288, 303 (1st Cir. 1998) ("[I]f [the expert's] analysis omitted . . . important variables, or was deficient in other respects . . . it was up to defendants to exploit and discredit the analysis during cross examination.").

Olivet next contends that Adriaansen did not apply the aesthetic functionality test properly because he failed to address the relevant market. A design "'is aesthetically functional . . . where protection of the [design] significantly undermines competitors' ability to compete in *the relevant market.*'" *Hillside Plastics, Inc. v. Dominion & Grimm U.S.A., Inc.*, No. 17-cv-30037-MGM, 2018 WL 4537205, at *10 (D. Mass. Aug. 6, 2018) (emphasis altered) (quoting *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 222 (2d Cir. 2012)). Adriaansen analyzed plastic products sold within the relevant market, which is composed of consumers ages 24 to 65 seeking such products. *See* ECF 105-13, ¶ 53; ECF 121, ¶ 358. He also assessed products that Olivet's fact witnesses had identified in a "Market Comparison" before this case was filed.

ECF 105-13, ¶ 76. Based on his analysis, Adriaansen determined that Olivet's products are "virtually identical in appearance" to Sterilite's. *Id.* ¶ 54. To the extent Olivet wishes to challenge Adriaansen's assessment of the relevant market and application of the aesthetic functionality test, it may do so at trial through "[v]igorous cross-examination" and "the presentation of contrary evidence." *Daubert*, 509 U.S. at 596.

Olivet's final argument—that Adriaansen's opinions regarding the similarity of Sterilite's and Olivet's products would be unhelpful to the jury—fares no better. Olivet asserts that "the untrained layman is in the best position" to assess the products' similarities. ECF 107, at 26. But where, as here, "the witness's opinions are informed by expertise, they are . . . more helpful than the opinions of a lay witness." *United States v. Shay*, 57 F.3d 126, 133 (1st Cir. 1995). Adriaansen has over forty years working as an industrial designer, is a named inventor of a dozen United States design patents, has designed injection-molded plastic products, and currently works as the principal human factors design engineer at Medtronic. ECF 105-13, ¶¶ 6, 16, 33, 38. After assessing the products' dimensions and other features, he concluded that the cabinets made by Sterilite and Olivet were "so similar that parts from each product can be used to assemble a full unit," their "drawers can be interchanged between units," and their 11-gallon wastebasket lids were "so similar that the lids . . . can be each used on the others' bases." *Id.* ¶¶ 102, 148, 208. Because Adriaansen's assessment regarding the similarity of Olivet's and Sterilite's products could be helpful to the jury, his opinions will not be excluded. *See V & S Vin & Sprit Aktiebolag v. Cracovia Brands, Inc.*, No. 01-cv-9923, 2004 WL 42375, at *2 (N.D. Ill. Jan. 5, 2004) (considering conflicting expert testimony concerning marks' similarity); McCarthy on Trademarks and Unfair Competition § 23:2.75 (5th ed.) ("McCarthy") (expert witness testimony "is generally allowed on . . . factors which are used to analyze . . . if there is a likelihood of confusion").

C.      Sara Rinke.

Olivet lastly seeks to exclude the supplemental report of Sterilite's damages expert, Sara Rinke, as untimely, and her opinions concerning Sterilite's lost profits as unreliable.[4] Olivet's arguments are unpersuasive.

Where, as here, there is no court order, "any supplemental expert report must be filed 'in a timely manner' and no later than 'the time the party's pretrial disclosures under Rule 26(a)(3) are due,'" *In re Zofran (Ondansetron) Prod. Liab. Litig.*, No. 15-MD-2657-FDS, 2019 WL 5423907, at *5 (D. Mass. Oct. 23, 2019) (quoting Fed. R. Civ. P. 26(e)), which is "at least 30 days before trial," Fed. R. Civ. P. 26(a)(3)(B). Under Federal Rule of Civil Procedure 26, Rinke's report was timely because it was served on September 28, 2023, not only well before a yet-to-be-scheduled trial, but also nearly two months before the close of expert discovery on November 22, 2023. *See* ECF 58; ECF 117, at 29; *Traverse v. Gutierrez Co.*, No. 18-cv-10175-DJC, 2020 WL 9601832, at *7-8 (D. Mass. May 18, 2020) (not excluding untimely supplemental report).[5]

Olivet also contends that Rinke's opinions about Sterilite's lost profits should be excluded as unreliable because she used inaccurate data in her original report, and then failed to verify the revised data in her supplemental report. The Court disagrees. "Federal Rule of Civil Procedure 26(e)(2) requires a party to supplement information included in the expert report" in part "'to avoid trial by ambush.'" *Curet-Velazquez v. ACEMLA de Puerto Rico, Inc.*, 656 F.3d 47, 56 (1st Cir. 2011) (quoting *Macaulay v. Anas*, 321 F.3d 45, 50 (1st Cir. 2003)). "Ordinarily, the proper scope

---

[4] Olivet does not question the qualifications of Rinke, who has "assess[ed] damages on well over a hundred cases" in the past 25 years and provided expert testimony or reports in 22 cases since 2008. ECF 118-53, at 23:6-24:16, 49:21-50:6.

[5] Olivet's reliance on an order requiring Sterilite to "serve Rule 26(a)(2) reports no later than" June 30, 2023, ECF 47, is misplaced because the Court later issued an updated order extending the expect discovery deadline to November 22, 2023, *see* ECF 58.

of a supplemental report is limited to 'correcting inaccuracies' or 'filling interstices' in an initial report," and in certain cases, "new developments or discoveries may permit (or indeed require) a supplemental report." *In re Zofran*, 2019 WL 5423907, at *3 (quoting *Munchkin, Inc. v. Playtext Prods., LLC*, 600 Fed. App'x. 537, 538 (9th Cir. 2015)).

Rinke's supplemental report served this function: it updated her June 2023 calculation of Sterilite's lost profits based on new data reflecting the increased cost of plastic resin, the main input in Sterilite's products. The revision of her opinions, in light of new data, does not undermine the reliability of those opinions. Moreover, Olivet fails to explain how it was harmed or prejudiced by Rinke's supplemental report, particularly where it was able to question her about the data and her calculations at her deposition nearly two months after receiving the report. *See* ECF 117, at 29; Fed. R. Civ. P. 37(c) (permitting untimely supplemental reports where the delay "was substantially justified or is harmless"); *Thibeault v. Square D Co.*, 960 F.2d 239, 247 (1st Cir. 1992) ("[P]reclusion of expert testimony is a grave step, not to be undertaken lightly."). Absent any claim of prejudice or surprise by Olivet, or any basis for concluding that Rinke's opinions are substantively unreliable, her opinions regarding Sterilite's lost profits will not be excluded. *See Curet-Velazquez*, 656 F.3d at 56 (affirming admission of expert testimony regarding documents that were not included in his report).

## III. <u>Sterilite's Motion to Exclude Portions of Three of Olivet's Expert Opinions.</u>

Sterilite, for its part, seeks to exclude under Rule 702 certain portions of the opinions of (1) Dr. H. Tolga Bilgicer, Olivet's survey expert; (2) Juli Saitz, its damages expert; and (3) Paul Hatch, its design expert.

A.      Dr. H. Tolga Bilgicer.

Olivet's survey expert, Dr. H. Tolga Bilgicer, submitted a report to rebut O'Shea's opinions on secondary meaning and likelihood of consumer confusion. *See* ECF 111-15. Sterilite seeks to exclude the surveys and supporting testimony of Dr. Bilgicer for four reasons.

First, Sterilite contends that the surveys are unreliable because they violate the established "anonymous source" rule, which "requires . . . that consumers view the design as indicating that the product comes from a *single* source, even if they cannot name the source in question." *Straumann Co. v. Lifecore Biomedical Inc.*, 278 F. Supp. 2d 130, 137 (D. Mass. 2003) (emphasis in original); *see* McCarthy § 15:8 ("All courts agree that secondary meaning exists when the ordinary buyer of these goods or services associates the designation with a single, albeit anonymous, source."). In Sterilite's view, Dr. Bilgicer ran afoul of this rule because his surveys asked whether respondents associate a Sterilite product "with any *specific* company or companies that makes or puts out plastic housewares," rather than "with one company or more than one company." ECF 112, at 7, 9 (emphasis added). If respondents answered "no" to this question, they were excluded. Sterilite argues that, by including the word "specific" in the question, Dr. Bilgicer included only respondents who associated the trade dress with Sterilite or another specific company, and therefore inappropriately excluded respondents who linked the trade dress to a single, but unknown, company. ECF 110, at 11 (citing *Kars 4 Kids, Inc. v. Am. Can!*, No. 314-cv-7770-PGS-DEA, 2019 WL 1755912, at *9 (D.N.J. Apr. 18, 2019) ("the question – 'Do you associate the term you just heard with one particular organization or with more than one organization?' – was confusing" and "weighs against admitting the survey into evidence")).

The Court is not persuaded that this survey phrasing renders Dr. Bilgicer's method unreliable. As Olivet points out, other tribunals have approved similar trade dress surveys on

secondary meaning. For example, the Trademark Trial and Appeal Board endorsed a survey that first asked whether respondents associate a product "with a specific brand or company," and if so, then asked them to name the "brand or company." *In re Jockey Int'l, Inc.*, 1976 WL 21154, at *2 (T.T.A.B. Sept. 30, 1976). The Federal Circuit similarly credited a survey that first asked respondents whether they would know from an unlabeled container "if the spices came from a single manufacturer" or "from different manufacturers," and if the former, then asked "[w]hich one manufacturer would spices in this container have come from." *Tone Bros. v. Sysco Corp.*, 28 F.3d 1192, 1203 (Fed. Cir. 1994). And a leading treatise confirms that "a survey may ask respondents whether they associate a mark or trade dress with a specific brand or company and, if so, which one." 2 Gilson on Trademarks § 8.03 (2023). Sterilite's dissatisfaction with Dr. Bilgicer's survey language and his associated secondary meaning opinions goes to weight, not admissibility, and may be explored on cross-examination. *See* McCarthy § 32:170 ("The majority rule is that while technical deficiencies can reduce a survey's weight, they will not prevent the survey from being admitted into evidence."); *Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.*, 618 F.3d 1025, 1038 (9th Cir. 2010) (valid criticisms about "methodology, survey design, reliability, . . . [and] critique of conclusions . . . go to the weight of the survey rather than its admissibility" (quotation marks omitted)).[6]

Second, Sterilite argues that the images used in the surveys improperly omitted certain elements of its trade dress. Olivet acknowledges that the surveys did not show every vantage point of Sterilite's products, including the cabinet's back panel and the wastebasket's underside, but

---

[6] Dr. Bilgicer's results somewhat belie Sterilite's concern that respondents believed that they needed to have a particular company in mind to answer in the affirmative, because the results revealed that most people who responded that they associated Sterilite's product with a single company did *not* identify a specific company in the follow-up question.

asserts that Dr. Bilgicer selected these images from Walmart and Amazon's websites and decided to display the products' "most prominent" features. ECF 112, at 10-11. Even if, as Sterilite responds, consumers would see the entire product in stores and more of the trade dress on Walmart's website, such surveys need not ensure that "every possible element of the trade dress is visible in the test images." *In-N-Out Burgers v. Doll n' Burgers LLC*, No. 20-11911, 2022 WL 791924, at *7 (E.D. Mich. Mar. 14, 2022). Sterilite's arguments about the under-inclusivity of Dr. Bilgicer's images can be addressed at trial and do not warrant exclusion of the evidence altogether. *See id.* ("[T]he underinclusive set of images employed by the survey [may] weig[h] against the relevance of its results, but this alleged methodological defect clearly does not justify exclusion.").

Third, Sterilite maintains that Dr. Bilgicer's surveys employed improper controls. A "control should 'shar[e] as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed.'" *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 240 (S.D.N.Y. 2010) (citation omitted). According to Sterilite, Dr. Bilgicer inappropriately "deflated his net secondary meaning results" by relying on control images from "well-known brands that themselves have secondary meaning." ECF 110, at 15. However, as Sterilite's cited treatise explains, "a survey with an imperfect control group generally provides better information than a survey with no control group at all, but the choice of the specific control group requires some care and *should influence the weight* that a survey receives." Shari Seidman Diamond, *Reference Guide on Survey Research*, MANUAL ON SCIENTIFIC EVIDENCE, at 258 (2d ed. Fed. Jud. Ctr. 2000) (emphasis added). Thus, even accepting Sterilite's criticisms of the control group images (which Olivet contests), its objections go to weight rather than admissibility. *See GeigTech E. Bay LLC v. Lutron Elecs. Co.*, No. 18-cv-5290-CM, 2023 WL 6614486, at *17 (S.D.N.Y. Sept. 20, 2023) ("Any issues with the control stimuli . . . go only to weight but do not

merit exclusion."); *In-N-Out Burgers*, 2022 WL 791924, at \*7 (not excluding survey "[b]ecause the control images are not blatantly inappropriate" and "[t]he factfinder . . . can judge the degree of bias these images may have introduced").

Fourth, Sterilite asserts that Dr. Bilgicer's surveys used an unreliably small sample size of less than 100 respondents per arm instead of the standard 200. *See* Shari Seidman Diamond and Jerre B. Swann, *Trademark and Deceptive Advertising Surveys*, at 90 (2d ed. 2022) (ECF 111-17, at 4) (stating that "[m]ost commonly, we see samples of no less than 200 per arm (assuming a large enough universe)," and that "a modest increase in sample size, may give the comfort of optics, but with only a nominal gain in statistical precision"). Dr. Bilgicer testified that "it was actually challenging" to obtain a large sample of actual or prospective buyers because the disputed products are not every-day "popular" consumer goods. ECF 113-17, at 265:3-266:17. Sterilite's objections to the sample size used in Dr. Bilgicer's surveys, however, attack the weight of the surveys instead of their admissibility. *See* McCarthy § 32:171 ("Conducting a survey with a number of respondents too small to justify a reasonable extrapolation to the target group at large will lessen the weight of the survey."); *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, 364 F. Supp. 3d 291, 326 (S.D.N.Y. 2019) (objections about methodology, including sample size, "[o]rdinarily . . . attack the weight of the expert report rather than its admissibility" (citing *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 228 (2d Cir. 1999)). Because Dr. Bilgicer's survey evidence is sufficiently reliable and relevant and would assist the trier of fact, the evidence will not be excluded.

B.    Juli Saitz.

Sterilite next seeks to exclude the opinions of Olivet's damages expert, Juli Saitz, regarding (1) the cause of Sterilite's damages and (2) Olivet's profits. The Court agrees with the exclusion of the former but not the latter.

With respect to causation, Saitz opines that "Sterilite has not suffered any actual damages as a result of Olivet's sale of the Accused Products" because, in her assessment, Sterilite caused its own damages when it was unable to meet Walmart's production demands during the COVID-19 pandemic. ECF 111-13, ¶¶ 9-10, 23. In reaching that conclusion, however, Saitz overlooked or ignored substantial evidence that Walmart requested, and Olivet agreed to produce, replicas of Sterilite's products. *See* ECF 110, at 18-19 (Saitz also recognizing in her report that "it is important for experts to consider *other intervening acts* that may be the cause of any claimed harmed" (emphasis altered) (quoting ECF 111-13, ¶ 46)). Saitz's failure to consider or grapple with evidence that contradicts her opinion, coupled with her selective use of facts, undermines her reliability and renders her subjective opinion on causation inadmissible under *Daubert* because "'there is simply too great an analytical gap between the data and the opinion proffered.'" *Rodríguez*, 91 F.4th at 70-71 (quoting *Joiner*, 522 U.S. at 146); *see Iconics, Inc. v. Massaro*, 266 F. Supp. 3d 461, 473 (D. Mass. 2017) (excluding "unsubstantiated and conclusory testimony" that "lack[ed] any methodological explanation"); *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*, 853 F. Supp. 2d 181, 188 (D. Mass. 2012) (precluding expert testimony that "cherry-picked" certain data points), *aff'd sub nom. Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82 (1st Cir. 2014). Moreover, Saitz's opinion that the cause of Sterilite's damages was its own deficiencies, rather than Olivet's alleged infringement of its trade dress, is more appropriately the province of the finder of fact than an expert, particularly where Saitz's opinion is not rooted in her area of expertise. *See Swift v. United States*, 866 F.2d 507, 510 (1st Cir. 1989) ("Application of the legal cause standard to the circumstances of a particular case is a function ordinarily performed by, and peculiarly within the competence of, the factfinder."); *Graystone Funding Co., LLC v. Network Funding, L.P.*, 598 F. Supp. 3d 1228, 1248

(D. Utah 2022) ("[I]t is not a damages expert's responsibility to establish causation."). The Court will, accordingly, grant Sterilite's motion to exclude testimony from Saitz related to the cause of Sterilite's damages.[7]

With respect to Olivet's profits, Saitz opines that Olivet incurred a smaller net loss than previously reported in producing the products at issue after discovering a "clerical error" that allegedly understated its costs. ECF 111-13, ¶ 33. Sterilite contends that the new cost data used by Saitz is untimely and unreliable because Olivet's Chief Financial Officer previously represented that its prior "fourth-iteration" profit and loss data was accurate, and Sterilite's expert, in turn, relied on that data. ECF 110, at 21-23. While the testimony of the Chief Financial Officer as the designated Rule 30(b)(6) representative is binding on Olivet, *see SiOnyx, LLC v. Hamamatsu Photonics K.K.*, No. 1:15-cv-13488-FDS, 2017 WL 8236153, at *2 (D. Mass. Oct. 13, 2017), Saitz was still permitted to rely on the new cost data in preparing her report, regardless of the data's admissibility,[8] *see United States v. Tavares*, 843 F.3d 1, 7 (1st Cir. 2016) ("An expert may rely on information not itself admitted into evidence when forming an opinion" as well as "information that is not independently admissible."). Sterilite is free to challenge the reliability of the "fifth-iteration cost document," ECF 110, at 21, at trial through "the adversary process—competing expert testimony and active cross-examination," *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*,

---

[7] Sterilite acknowledged at the motion hearing that its damages expert, Sara Rinke, likewise cannot opine on causation. *See* ECF 135, at 59:14-20 ("Having said that, we're perfectly comfortable, and in . . . fact we do not intend to have Ms. Rinke actually offer the opinion at trial, that Sterilite's damages were caused by all of that. We will put in the evidence of that and we can deal with that sort of with fact witnesses and argue it to the jury in closing, but we don't think it's appropriate, frankly, for either expert to address causation.").

[8] Sterilite also contends that this underlying cost data should be rejected under Federal Rule of Civil Procedure 37(c)(1). ECF 110, at 22 & n.9. However, like its motion to strike, this request is procedurally improper because Sterilite failed to file a separate motion supporting the request. *See* Local Rule 7.1.

161 F.3d 77, 85 (1st Cir. 1998). Accordingly, Saitz's opinion regarding Olivet's lost profits will not be excluded because "whatever shortcomings exis[t] . . . [go] to the weight, not the admissibility, of the testimony." *Cummings v. Standard Reg. Co.*, 265 F.3d 56, 65 (1st Cir. 2001).

       C.    <u>Paul Hatch.</u>

       Finally, Sterilite seeks to exclude the rebuttal testimony of Olivet's industrial design expert, Paul Hatch, regarding (1) the aesthetic functionality of Sterilite's products and (2) the functionality of its overall trade dress. The Court agrees that exclusion of the latter, but not the former, is warranted.

       With respect to aesthetic functionality, Hatch opines that each feature of Sterilite's products "serve[s] an aesthetic purpose wholly independent of any source identifying function but offer[s] an intrinsic aesthetic appeal in the relevant market and therefore has aesthetic functionality." ECF 111-20, ¶¶ 50, 54, 77, 83, 89, 104, 108, 131, 136 (emphasis omitted); *see id.* ¶ 61 (similar). Sterilite, in response, contends that Hatch fails to identify a relevant market and to analyze "why the numerous available alternative designs are incapable of satisfying the aesthetic desires of prospective consumers." ECF 110, at 26-27. Sterilite may disagree with Hatch's defined market from his report or deposition and take issue with his lack of research on that market, but such qualms are best addressed through "[v]igorous cross-examination" rather than exclusion of his testimony. *Daubert*, 509 U.S. at 596.

       Hatch separately opines that, for each product's overall design, when the elements are "combined together, the purported trade dress is also functional" because "all . . . of the trade dress elements . . . are functional." ECF 111-20, ¶¶ 63-64, 92-93, 116-17, 145-46. Olivet suggests that Hatch's finding that "each of these features [is] functional is *necessarily* a finding that the overall product design is functional." ECF 112, at 23 (emphasis added). But under First Circuit precedent,

the "fact that a product contains some functional elements does not . . . preclude Lanham Act protection," because a "'particular arbitrary combination of functional features, the combination of which is not itself functional, properly enjoys protection.'" *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 37 (1st Cir. 1998) (quoting *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1119 (5th Cir. 1991), *aff'd*, 505 U.S. 763 (1992)). Thus, as Sterilite urges, Hatch's methodology is flawed because he considered the trade dress elements in isolation, but did not also examine the design as a whole. *See* ECF 22; *Rimowa Distribution, Inc. v. Travelers Club Luggage, Inc.*, 217 F. Supp. 3d 400, 414 (D. Mass. 2016) ("An arbitrary pattern of functional elements may itself be non-functional."); *Genesis Strategies, Inc. v. Pitney Bowes, Inc.*, 50 F. Supp. 3d 59, 64 (D. Mass. 2014) ("While there may be some functional aspects of the design, the Court needs to determine if the overall design is functional."), *on reconsideration in part*, No. 11-cv-12270-TSH, 2014 WL 4292830 (D. Mass. Aug. 27, 2014). Hatch's failure to consider the overall functionality of the design of Sterilite's products renders his opinions regarding the functionality of Sterilite's overall trade dress—set forth in paragraphs 64, 93, 117, and 146 of his report—inadmissible.

## OLIVET'S MOTION FOR SUMMARY JUDGMENT

### I.     <u>Standard of Review.</u>

Summary judgment is appropriate when, based upon the record, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). To prevail, the moving party must show that "there is no factual determination which a 'rational factfinder' could make as to the 'existence or nonexistence' of a

fact that 'has the potential to change the outcome of the suit.'" *Gibson Found., Inc. v. Norris*, 88 F.4th 1, 5 (1st Cir. 2023) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4-5 (1st Cir. 2010)). Courts "must consider the record and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant," but "need not credit 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Dixon-Tribou v. McDonough*, 86 F.4th 453, 458 (1st Cir. 2023) (quoting *Lahens v. AT&T Mobility Puerto Rico, Inc.*, 28 F.4th 325, 333 (1st Cir. 2022)). The non-moving party may not simply "rest upon mere allegation or denials," but instead "must present affirmative evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

## II.    <u>Lanham Act Trade Dress Infringement Claim.</u>

"Section 43(a) of the Lanham Act provides protection against the use of 'any word, term, name, symbol, or device' that 'is likely to cause confusion, or to cause mistake, or to deceive' as to the source of a product." *Lund*, 163 F.3d at 35 (quoting 15 U.S.C. § 1125(a)). "The Lanham Act extends protection not only to words and symbols, but also to 'trade dress,' defined as 'the design and appearance of a product together with the elements making up the overall image that serves to identify the product presented to the consumer.'" *Yankee Candle*, 259 F.3d at 37-38 (quoting *Silva*, 118 F.3d at 58); *see Jack Daniel's Properties, Inc. v. VIP Prod. LLC*, 599 U.S. 140, 145 (2023) (defining "trade dress" as "the overall appearance of a product and its packaging"). To establish that its trade dress is protectible under the Lanham Act, "a plaintiff must prove that the dress is: (i) used in commerce; (ii) non-functional; and (iii) distinctive." *Yankee Candle*, 259 F.3d at 38. And, to prove infringement of its protected trade dress, "the plaintiff must show that another's use

of a similar trade dress is likely to cause confusion among consumers as to the product's source."
*Id.*[9]

Olivet contends that it is entitled to summary judgment on Sterilite's trade dress infringement claim because, as a matter of law, Sterilite has failed to demonstrate that its claimed trade dress is non-functional and distinctive. A product's feature is generally functional "'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article,' that is, if exclusive use of the feature would put competitors at a significant non-reputational-related disadvantage." *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 165 (1995) (quoting *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 850 n.10 (1982)). And a product's design is distinctive if it has acquired secondary meaning, which occurs when "the public views its 'primary significance . . . as identify[ing] the source of the product rather than the product itself.'" *Yankee Candle*, 259 F.3d at 38 (quoting *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 211 (2000)).

A.    Non-Functionality.

Olivet first contends that Sterilite cannot establish non-functionality. Courts employ two tests to determine whether trade dress is functional and thus not subject to protection under the Lanham Act: the (1) utilitarian functionality and (2) aesthetic functionality tests. *See Hillside Plastics*, 2018 WL 4537205, at *7. Under both tests, genuine issues of material fact preclude summary judgment in favor of Olivet.

---

[9] At the March 13 hearing, Olivet's attorney stated that, for purposes of the motion for summary judgment, it is not contesting the likelihood of consumer confusion. ECF 135, at 7:5-22.

1.     *Utilitarian Functionality.*

Under the utilitarian functionality test, a design is "functional when it is essential to the use or purpose of the device or when it affects the cost or quality of the device." *TrafFix Devices*, 532 U.S. at 33. "To boil it down to a phrase: something is 'functional' if it works better in this shape." *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, 986 F.3d 250, 258 (3d Cir. 2021) (quoting McCarthy § 7:63), *as amended* (Mar. 10, 2021). A design is functional, in other words, if it "'enables a product to operate, or improves on a substitute design in some way (such as by making the product cheaper, faster, lighter, or stronger).'" *Hillside Plastics*, 2018 WL 4537205, at *8 (quoting *Jay Franco & Sons, Inc. v. Franek*, 615 F.3d 855, 857 (7th Cir. 2010)). As discussed, "[t]he fact that a product contains some functional elements does not, however, preclude Lanham Act protection," for even a "'particular arbitrary combination of functional features, the combination of which is not itself functional, properly enjoys protection.'" *Lund*, 163 F.3d at 37 (quoting *Taco Cabana*, 932 F.2d at 1119); *see Yankee Candle*, 259 F.3d at 39 n.8 ("[A] combination of functional elements may itself be entitled to trade dress protection."). This is because the "crucial inquiry is into the effect that granting protection will have on the opportunity of others to compete." *Lund*, 163 F.3d at 37.

Sterilite has provided sufficient evidence to establish a genuine issue of material fact regarding the utilitarian functionality of all five of the disputed products. The report of Sterilite's product design expert, David Adriaansen, opines, for instance, that other competitors, unlike Olivet, have created products that perform the same functions as Sterilite's products without adopting Sterilite's trade dress. ECF 105-13, ¶¶ 53-55. Indeed, the record reveals that at least four such competitors employ different designs than Sterilite to produce their cabinets, drawers, and wastebasket lids. *See* ECF 121, ¶¶ 359, 363-64 (cabinets); *id.* ¶ 370 (drawers); *id.* ¶¶ 373-75

(wastebasket lids). Some of those designs, which Olivet considered, are cheaper to produce and, aside from Olivet's, look different than Sterilite's products. The availability of alternative designs creates a question of fact whether Sterilite's trade dress is essential to sell competitive products. *See Talking Rain Beverage Co. Inc. v. South Beach Beverage Co.*, 349 F.3d 601, 603 (9th Cir. 2003) ("[T]he existence of alternative designs may indicate whether the trademark itself embodies functional or merely ornamental aspects of the product."); *see Hillside Plastics*, 2018 WL 4537205, at *8 (considering "the availability of alternative designs"); *SoClean, Inc.*, 554 F. Supp. 3d at 300 (same and observing that the "Second, Fourth, Seventh, and Federal Circuits have similarly looked to alternative designs as important evidence of functionality").

Sterilite has also produced evidence that each of its products' overall designs, as a whole, and their individual elements, in isolation, were arbitrary and unnecessary for the products to operate for their intended purpose. With respect to Sterilite's cabinets, Sterilite's Rule 30(b)(6) witness, Rich Ahern, testified, for example, that the back panel inset of the 2-shelf cabinets is "decoration," as "[t]here's no particular reason why the pattern's there." ECF 121, ¶ 365; ECF 118-11, at 51-52. Ahern also testified that the rectangular handles that taper in width from the center to the side of the unit were "designed to create something that was . . . pleasant to look at and desirable from a consumer's standpoint." ECF 115, ¶ 153; ECF 118-11, at 47. The curved inset profile of the cabinet doors is, according to Adriaansen, similarly an arbitrary design choice because "there are many ways to design inset profiles on cabinet doors," including "inset squares, rectangles, or vertical or horizontal grooves" that are used by competing products. ECF 115, ¶ 151.

Likewise, Sterilite's side panels with their own inset profile and back panels with a geometric inset pattern constitute, in Adriaansen's words, "aesthetic choices." *Id.* ¶ 154.[10]

Regarding Sterilite's four-drawer units, Adriaansen described the aesthetic features of the drawers' design, including "the added curvature of the drawer fronts; integrated drawer bottoms and front edge of the top cover; [and] unique accent handles with recessed areas." ECF 105-13, ¶ 127. He opined that the drawers' "curvature . . . could have been implemented in many different ways." ECF 115, ¶ 185. The drawers' handles did not need to have downward curved leading edges because, according to Adriaansen, competitors use handles inset in the plastic instead of visible external handles. ECF 121, ¶ 371. Likewise, Adriaansen opined that Sterilite's top and bottom panels with outward curved leading edges appear as an "integrated feature of the drawer unit," rather than "flat, convex, faceted, wavy, or ribbed, among many other design choices." ECF 105-13, ¶ 124. Further, in Adriaansen's view, the "gentle curve" of the Sterilite's drawer faces, as opposed to flat front faces, "creates a simple, softened minimalist look." *Id.* ¶ 126.

As to Sterilite's 13-gallon wastebasket lid, Adriaansen described how "the particular angle chosen for the slope of the asymmetrical top, and the front curve of the lid that matches the curve of the door . . . together create an integrated, inviting aesthetic" for the 13-gallon wastebasket. *Id.* ¶ 156. After assessing eight competitors' wastebaskets, he determined that they do not use Sterilite's trade dress, yet show "no loss of . . . functions (e.g., ease of putting items into the trash and the ability to swing back and forth)." *Id.*; ECF 121, ¶ 375. The asymmetrically sloped top with

_____

[10] Sterilite's now-expired 2-shelf cabinet design patent also provides "relevant evidence suggesting non-functionality." *Keystone Mfg. Co. v. Jaccard Corp.*, No. 03-cv-648-S, 2007 WL 655758, at *9 (W.D.N.Y. Feb. 26, 2007); *see Depaoli v. Daisy Mfg. Co.*, No. 07-cv-11778-DPW, 2009 WL 2145721, at *1 (D. Mass. July 14, 2009) ("'A design patent protects the nonfunctional aspects of an ornamental design as shown in the patent.'" (quoting *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995))); ECF 121, ¶ 362; ECF 118-45.

a curved swing top door is also, in Adriaansen's opinion, aesthetic because it could have had a different shape, including "as domed or A-frame, with no loss of . . . functions." ECF 115, ¶ 197. He further stated that "the particular arcs chosen for the top and bottom of the handle represent unique design choices," ECF 105-13, ¶ 157, given that competitors use different curvature, sharper angles, or divots in the frame, ECF 115 ¶ 206. The integrated handle, as Ahern testified, "made for sort of an attractive detail." *Id.* ¶ 209. Finally, Sterilite's specific rib configuration is, according to Adriaansen, "not necessary for a swing-top lid to function, as evidenced by other swing top wastebaskets on the market that do not have ribs." ECF 105-13, ¶ 158.

Concerning the 11-gallon wastebasket lid, Adriaansen concluded that its design "is nonfunctional, because it forms a clean, modern, simple aesthetic, with tapered corners on the lid, a smooth transition from the subtly domed cover to the handle; a glossy finish that cleanly accentuates the handle; and the curved inset profile of the handle that arcs gracefully above the lid." *Id.* ¶ 191. Sterilite's website similarly states that the "unique design of the lid makes opening the wastebasket easy," and that it "integrates functionality with a simple, elegant appearance." ECF 115, ¶ 228. Adriaansen also explored the "many designs that can achieve the [same] function" as the 11-gallon wastebasket lid. ECF 105-13, ¶ 192. Yet, as Adriaansen opined, Olivet's "lid is extremely similar in appearance to" Sterilite's, so much so that the lids of Sterilite and Olivet "can each be used on the others' [11-gallon wastebasket] bases." *Id.* ¶¶ 203, 207.

In view of this evidence, and notwithstanding the competing testimony of Olivet's expert describing the alleged functionality of Sterilite's trade dress, triable disputes of material fact exist as to the utilitarian functionality of Sterilite's asserted trade dress. *See Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005) ("[C]ompeting expert opinions present the classic battle of the experts and it [is] up to a jury to evaluate what weight and credibility each expert opinion deserves."

(quotation marks omitted)); *SoClean*, 554 F. Supp. 3d at 302 ("Functionality . . . is a question of fact that, like other factual questions, is generally put to a jury" (quoting *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014)); *Hillside Plastics*, 2018 WL 4537205, at *8 ("[C]ourts have consistently held that [f]unctionality is a question of fact[.]" (quotation marks omitted)).

2.    <em>Aesthetic Functionality.</em>

The Court turns next to the aesthetic functionality test. Because "a functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage,'" the Supreme Court has said that "[i]t is proper to inquire into a 'significant non-reputation-related disadvantage' in cases of esthetic functionality." *TrafFix*, 532 U.S. at 32-33 (quoting *Qualitex*, 514 U.S. at 165). Under the Restatement (Third) of Unfair Competition's articulation of the aesthetic functionality test, "if a design's 'aesthetic value' lies in its ability to 'confe[r] a significant benefit that cannot practically be duplicated by the use of alternative designs,' then the design is 'functional.'" *Qualitex*, 514 U.S. at 170 (quoting Restatement (Third) of Unfair Competition § 17, cmt. c). While the First Circuit has not expressly embraced the aesthetic functionality test, it has observed that, when assessing functionality generally, the "crucial inquiry is into the effect that granting protection will have on the opportunity of others to compete." *Lund*, 163 F.3d at 37.

Sterilite has proffered evidence, as discussed, that alternative designs exist for its cabinets, drawers, and wastebaskets that are competitive in the market. At least four of Sterilite's competitors use different designs than Sterilite to produce their cabinets, drawers, and wastebaskets. ECF 121, ¶¶ 359, 363-64, 370, 373-75. This evidence gives rise to a triable issue on whether the Sterilite's claimed trade dress is aesthetically non-functional. *See* Restatement (Third)

of Unfair Competition § 17, cmt. c ("A design is functional because of its aesthetic value only if it confers a significant benefit that cannot practically be duplicated by the use of alternative designs."). As the Sixth Circuit has explained, "a party's initial burden to show that a design lacks aesthetic functionality is not substantial; the plaintiff need only show that the design is not a competitive necessity such that 'exclusive use . . . would put competitors at a significant non-reputation related disadvantage.'" *Leapers, Inc. v. SMTS, LLC*, 879 F.3d 731, 737 (6th Cir. 2018) (quoting *TrafFix*, 532 U.S. at 32-33). Sterilite has met its burden at this stage in the proceedings. *Compare id.* at 739 (reversing summary judgment where "numerous [alternative] designs" were available), *and McNeil-PPC, Inc. v. Merisant Co.*, No. 04-cv-1090 (JAG), 2004 WL 3316380, at *15 (D.P.R. July 29, 2004) (finding no aesthetic functionality because "the vast majority of products in the category do not use the color yellow in their trade dress, and there is no essential competitive reason to do so"), *with Bonazoli v. R.S.V.P. Int'l, Inc.*, 353 F. Supp. 2d 218, 227 (D.R.I. 2005) (granting defendant's summary judgment motion in part because there was no alternative to the plaintiff's heart-shaped spoon design); *see also Hillside Plastics*, 2018 WL 4537205, at *11 ("[T]he ultimate determination of aesthetic functionality concerns the question of whether or not alternative attractive designs for the same product exist.").

Olivet responds that Sterilite has not satisfied its burden because it has failed to "come forward with some evidence that the design features lack competitive necessity *in some relevant market*." ECF 119, at 7 (emphasis added). Olivet is correct that a design feature "'is aesthetically functional'" where protection would "'significantly undermin[e] competitors' ability to compete *in the relevant market*.'" *Hillside Plastics*, 2018 WL 4537205, at *10 (emphasis altered) (quoting *Christian Louboutin*, 696 F.3d at 222). But Sterilite has identified a relevant market primarily composed of consumers of plastic household products between 24 and 65 years old. ECF

121, ¶ 358. And in that market, as explained, there is evidence that alternative designs of the cabinets, drawers, and wastebasket lids are available and sold by Sterilite's competitors. *Id.* ¶¶ 359, 363-64, 370, 373-75.

In short, because Sterilite has proffered adequate evidence supporting non-functionality, Olivet's motion for summary judgment on the ground that the trade dress of Sterilite's products is functional will be denied. *See Bern Unlimited, Inc. v. Burton Corp.*, No. 11-cv-12278-FDS, 2013 WL 2149674, at *5 (D. Mass. May 15, 2013) (denying summary judgment where there was "a triable issue of fact as to the functionality of plaintiff's claimed trade dress").

    B.    <u>Secondary Meaning.</u>

Olivet next asserts that Sterilite has failed, as a matter of law, to establish that its claimed trade dress is distinctive. Recall that a product's design is "distinctive" if it has acquired secondary meaning. *See Wal-Mart Stores*, 529 U.S. at 214-16.

"'Proof of secondary meaning entails vigorous evidentiary requirements.'" *Bos. Beer Co. P'ship v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 181 (1st Cir. 1993) (quoting *Perini Corp. v. Perini Constr.*, 915 F.2d 121, 125 (4th Cir. 1990)). Direct evidence of secondary meaning—typically in the form of "consumer surveys and testimony by individual consumers"—is valuable, but not required. *Yankee Candle*, 259 F.3d at 43. Circumstantial evidence is also probative of secondary meaning, and courts may look to a number of factors, including "proof of intentional copying," "the nature and extent of advertising and promotion of the trade dress," "the length and manner of the use of the trade dress," "the product's 'established place in the market,'" "the efforts made to promote a conscious connection by the public between the trade dress and the product's source," and evidence of actual customer confusion. *Id.* at 43-45 (quoting *Lund*, 163 F.3d at 42). Considering the totality of Sterilite's circumstantial evidence, the Court concludes, for the reasons

described below, that there exists a genuine dispute of material fact as to whether the cabinets and drawers have acquired secondary meaning, but that Sterilite has failed to proffer sufficient evidence that its wastebasket lids have acquired secondary meaning.

    1. *Intentional Copying.*

  First, the record reflects that Olivet copied all five of Sterilite's products at Walmart's request. To establish intentional copying, Sterilite must demonstrate that Olivet "intentionally copied 'down to the smallest detail'" the design of its products. *I.P. Lund Trading ApS v. Kohler Co.*, 118 F. Supp. 2d 92, 113-14 (D. Mass. 2000) (citation omitted). Sterilite has met that standard.

  The evidence shows that Walmart told Olivet to make its products look exactly like Sterilite's. According to internal emails, Olivet sought to "match" Sterilite's products, "follow [Sterilite's] sample silhouette exactly," and "get exact silhouettes." ECF 117, at 9-10. Olivet even sent Sterilite's products to its manufacturing team in China to be replicated. *Id.* at 10. This followed Walmart's request that Olivet "replicate the design and look" of Sterilite's products. ECF 135, at 28:7-17. Olivet also produced components that were interchangeable with Sterilite's products and copied Sterilite's assembly manuals and accompanying letters of instruction. ECF 115, ¶ 331; ECF 114, at 9. A reasonable jury could infer from this evidence that Olivet "belie[ved] that [Sterilite's] trade dress has acquired secondary meaning," which, in turn, "provides some evidence that it actually has acquired secondary meaning." *Yankee Candle*, 259 F.3d at 45 (citing *Blau Plumbing, Inc. v. S.O.S. Fix-it, Inc.*, 781 F.2d 604, 611 (7th Cir. 1986)). Viewed in the light most favorable to Sterilite, the fact that Olivet sought to copy Sterilite's products and replace those products at Walmart indicates that Olivet "was not merely 'imitating the successful features' of [Sterilite's] design, but 'intend[ing] to deceive purchasers as to the source of the product.'" *SoClean*, 554 F. Supp. 3d at 306 (quoting *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 124

(2nd Cir. 2001)). A reasonable jury could, therefore, find that Olivet "was attempting to mislead consumers into believing that its [products] were" Sterilite's in order to capitalize on Sterilite's good name, *id.*, especially given that there were alternative designs available to Olivet, *see* ECF 121, ¶¶ 359, 363-64, 370, 373-75.

Nevertheless, as Olivet points out, "intent plays a particularly minor role in product design/configuration cases" because "the relevant intent is not just the intent to copy, but to 'pass off' one's goods as those of another." *Yankee Candle*, 259 F.3d at 45 (quoting *Blau Plumbing*, 781 F.2d at 611). In *Yankee Candle*, the First Circuit found that "the evidence of copying was [not] sufficiently probative of secondary meaning" because the defendant "prominently displayed its trade name on its candles." 259 F.3d at 45. Olivet contends that its products are similarly labeled as Hyper-Tough or Mainstays. But unlike in *Yankee Candle*, the Hyper-Tough and Mainstay labels are *Walmart's* private or house brands, not Olivet's. *See* ECF 115, ¶ 45; ECF 121, ¶ 333. Whether Olivet's inclusion of the Hyper-Tough or Mainstays labels prevents consumer confusion is a question of fact for the jury, especially where, as here and discussed below, there is evidence of actual customer confusion for at least some of Sterilite's products. *See Boston Bos. Athletic Ass'n v. Sullivan*, 867 F.2d 22, 34 (1st Cir. 1989) (finding "it fair to presume that purchasers are likely to be confused about the shirt's source" because "defendants intentionally referred to the Boston Marathon on its shirts" and "purchasers were likely to buy the shirts precisely because of that reference"); *Wenger S.A. v. Olivet Int'l.*, 2024 WL 36864, at *1 (S.D.N.Y. Jan. 3, 2024) ("[A] reasonable jury could find that consumers are likely to notice the logo on the front of the bag by itself" without seeing Olivet's "SwissTech" logo elsewhere on the bag.).

2.      *Actual Consumer Confusion.*

Second, Sterilite has produced several examples of customers confusing its cabinets for Olivet's. Olivet agrees that the six consumer reviews in the record concern Sterilite's 2-shelf or 4-shelf cabinets. ECF 119, at 4 & n.8. A customer in March 2022 wrote on Sterilite's Amazon product page, for instance, that they purchased two 4-shelf cabinets in 2020 that "were great" but the new ones were "deformed," "warped out of the box and extremely difficult to assemble." ECF 121, ¶ 351. Based on the picture that the customer had uploaded, O'Shea concluded that Sterilite did not produce the cabinet at issue because it lacked Sterilite's logo. ECF 105-12, ¶ 193. Another customer wrote a review on Walmart's website in October 2022 stating that Olivet's 4-shelf "Hyper-Tough cabinet is MUCH cheaper feeling" than "the more expensive garage storage solutions" that they had previously purchased. ECF 115, ¶ 128. These reviews provide "at least *some* evidence that consumers associate the trade dress with the source," particularly when considered in the light most favorable to Sterilite. *Yankee Candle*, 259 F.3d at 44 (emphasis in original).[11] Further, as O'Shea described, "for every review in which a customer was confused," there may be "dozens or hundreds more customers who were also confused and simply lacked the motivation or time to write a review." ECF 105-12, ¶ 194.

Sterilite has not provided any evidence, however, that consumers have confused its drawers or wastebasket lids for those of Olivet. This factor, therefore, supports Sterilite's claim of

---

[11] Olivet maintains that Sterilite's customer reviews are inadmissible because they are not attached to any declaration. But the two reviews referenced here are attached to declarations of counsel, *see* ECF 105, 118, and thus admissible. *See Giggle, Inc. v. netFocal, Inc.*, 856 F. Supp. 2d 625, 633 (S.D.N.Y. 2012) (considering "screenshots of websites and advertisements" in trademark infringement case because they were "authenticated by an affidavit from . . . counsel for Defendant"); *In re Fustolo*, 597 B.R. 1, 55 (Bankr. D. Mass. 2019) ("[I]f screenshots are properly authenticated, their use is permissible."), *aff'd*, No. 19-cv-10343-TSH, 2020 WL 636449 (D. Mass. Feb. 11, 2020), *aff'd*, No. 20-1308, 2023 WL 2422123 (1st Cir. Feb. 8, 2023).

secondary meaning with respect to its cabinets but not as to its drawers or wastebasket lids. *See A. Simon & Sons, Inc. v. Simonfurniture Int'l, Inc.*, No. 21-cv-11254-PBS, 2021 WL 6144611, at *5 (D. Mass. Nov. 19, 2021) ("[I]rate customers receiving defective goods from Defendants contacting Plaintiff . . . [is] evidence that customers associated furniture products with Plaintiff [and] is probative of secondary meaning.").

### 3. *Length and Manner of Sterilite's Use of the Trade Dress.*

Third, it is undisputed that Sterilite has used the trade dress of all five products for between 13 and 26 years. Sterilite has sold both of its cabinets since 1998, its drawers since 2002, and its 11-gallon and 13-gallon wastebasket lids since 2011 and 2003, respectively. ECF 115, ¶¶ 78-81. The fact that all five of these products have been in the market for over a decade supports Sterilite's claim of secondary meaning. *See Simon & Sons*, 2021 WL 6144611, at *4 (granting preliminary injunction where the plaintiff had used its mark for fourteen years); *Shames v. Coontz*, 882 F. Supp. 1173, 1174 (D. Mass. 1995) (same where the plaintiffs had "used their name steadily for 16 years with apparent considerable success"). Indeed, Olivet concedes that "Sterilite's use of the trade dress is . . . slightly in its favor." ECF 119, at 3. While Olivet is correct that "the length of use of a [design], without more, is not sufficient to show the kind of consumer association required to achieve secondary meaning," other factors also support secondary meaning. *Lyons v. Am. Coll. of Veterinary Sports Med. & Rehab., Inc.*, 997 F. Supp. 2d 92, 105 (D. Mass. 2014).

### 4. *Nature and Extent of Advertising.*

Fourth, the evidence demonstrates that Sterilite made significant investments to advertise its products, including those at issue here. ECF 115, ¶ 86; *see President & Trustees of Colby Coll. v. Colby Coll.-New Hampshire*, 508 F.2d 804, 808 (1st Cir. 1975) ("[T]he normal consequence of substantial publicity may be inferred."). While Sterilite spent most of its money on accrual

advertising with its main retail customers, Sterilite has also paid to advertise its products in the HomeWorld magazine displaying all or some of the claimed trade dress. ECF 115, ¶¶ 86-97, 342-45. In addition, Sterilite buys search engine optimization searches to improve the visibility of its products when consumers run searches on Google. *Id.* ¶¶ 86-87, 99-100, 103, 105.

Olivet argues, however, that there is a "lack of evidence as to advertising of the *specific* trade dress claimed" or so-called "'look-for' advertising . . . that specifically directs a consumer's attention to a particular aspect of the product." *Yankee Candle*, 259 F.3d at 44 (emphasis in original). Sterilite's social media posts and advertisements in HomeWorld display the trade dress of the disputed products. ECF 115, ¶¶ 86-97, 107, 110, 113, 342-45. But because "[m]erely 'featuring' the relevant aspect of the product in advertising" without "direct[ing] the consumer to those features claimed as trade dress" "is no more probative of secondary meaning than are strong sales," these images do not provide compelling evidence in favor of secondary meaning. *Yankee Candle*, 259 F.3d at 44. However, Sterilite has also produced social media posts highlighting the "heavy-duty, sleek drawer unit." ECF 115, ¶ 116. This description bears on the claimed trade dress because it invokes "the shape and appearance of the product as a whole." *Id.* ¶ 41(b). Accordingly, this factor supports, albeit minimally, Sterilite's assertion of secondary meaning with respect to its drawers, but not its cabinets or wastebasket lids.

### 5.   *Established Place in the Market.*

Finally, Sterilite has offered some evidence of its products' established place in the market. *See Yankee Candle*, 259 F.3d at 44 ("[P]ervasiveness of the trade dress may support the conclusion that a mark has acquired secondary meaning."). O'Shea noted, for example, that Sterilite's products have exceeded $100 million in sales since their introduction and have been Walmart's top-sellers for several years. ECF 115, ¶ 104. Olivet suggests that this evidence, by itself, is not

probative of secondary meaning. In Olivet's view, "'the successful sales [of the product] may be because consumers desire the product itself, rather than because consumers identify the source and care about who the source is.'" *Straumann*, 278 F. Supp. 2d at 139 (citation omitted). But in light of the evidence revealing, among other things, that Olivet sought to copy Sterilite's products even though alternative designs were available, a reasonable jury could conclude that Sterilite's products, in particular, were well-established in the market. This factor thus tips slightly in Sterilite's favor concerning all five of the challenged products.

6.     *Weighing the Evidence and the Factors.*

In Olivet's view, its consumer survey evidence, showing weak association between the asserted trade dress and Sterilite, outweighs Sterilite's circumstantial evidence and conclusively establishes that secondary meaning is lacking for all five products. Notwithstanding Sterilite's challenges to the survey methodology, those surveys constitute direct evidence that weighs against a finding of secondary meaning. But as the First Circuit has recognized, "survey evidence is not required," *Yankee Candle*, 259 F.3d at 43, and a court must consider all direct and circumstantial evidence bearing on secondary meaning, *see Unleashed Doggie Day Care, LLC v. Petco Animal Supplies Stores, Inc.*, 828 F. Supp. 2d 384, 392 (D. Mass. 2010) (addressing direct and indirect evidence).

Viewing the evidence in the light most favorable to Sterilite, as the non-moving party, there exists sufficient evidence for a reasonable jury to conclude that the trade dress for Sterilite's cabinets and drawers has acquired secondary meaning.[12] The factors concerning intentional

---

[12] *See also Skydive Arizona, Inc. v. Quattrocchi*, No. 05-cv-2656-PHX-MHM, 2009 WL 6597892, at *21 (D. Ariz. Feb. 2, 2009) (finding summary judgment "inappropriate" where "questions of fact remain as to whether Plaintiff's circumstantial evidence of secondary meaning" outweighs direct evidence that "seem[ed] to weigh against" finding secondary meaning), *aff'd*, 673 F.3d 1105 (9th Cir. 2012); *Bach v. Forever Living Prod. U.S., Inc.*, 473 F. Supp. 2d 1110,

copying, length and manner of use, and established place in the market favor all five Sterilite products. A handful of customer reviews—which may only be the tip of the iceberg—also suggest consumer confusion between Sterilite's cabinets and those of Olivet. This evidence, which was absent in *Yankee Candle*, is sufficient, when combined with the three other factors, "for a reasonable juror to find that the [cabinets'] trade dress had acquired a secondary meaning." *Yankee Candle*, 259 F.3d at 45. Likewise, in 2022, Sterilite posted across its social media platforms a photo of its drawers and highlighted an element of their trade dress. Such "advertising of the specific trade dress claimed" was similarly lacking in *Yankee Candle*. *Id.* at 44 (emphasis omitted). Olivet's motion for summary judgment will, therefore, be denied as to Sterilite's 2-shelf and 4-shelf cabinets as well as its 4-drawer storage unit.

Sterilite has not, however, presented sufficient evidence to create a triable issue as to whether the claimed trade dress for its wastebasket lids has acquired secondary meaning. There is no evidence, for example, that consumers confused Sterilite's lids for Olivet's, or that Sterilite advertised the trade dress of those lids. Sterilite has, accordingly, failed to satisfy the "vigorous evidentiary showing required" to withstand summary judgment, and the Court will grant Olivet's motion as to Sterilite's 11-gallon and 13-gallon wastebasket lids. *Id.* at 45.

## III.    Dilution Claim Under M.G.L. c. 110H, § 13.

Olivet next seeks summary judgment on Sterilite's claim under the Massachusetts anti-dilution statute, M.G.L. c. 110H, § 13. This statute entitles the holder of valid trade dress to injunctive relief if there is a "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a [design]." M.G.L. c. 110H, § 13; *see Bern Unlimited, Inc. v. Burton Corp.*,

---

1125 (W.D. Wash. 2007) (denying summary judgment because "[e]ven though some of the evidence suggests that consumers do not identify the trade dress with . . . the Plaintiffs, other evidence suggests that the trade dress has acquired secondary meaning").

95 F. Supp. 3d 184, 212 (D. Mass. 2015) (applying statute to trade dress dilution claim). To prevail on a claim under the statute, "the plaintiff must show (1) that its [design] is distinctive, and (2) that the defendant's use of a similar [design] has created the likelihood of dilution." *Astra Pharm. Prod., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1209 (1st Cir. 1983) (examining predecessor statute, M.G.L. c. 110B, § 12); *accord Jenzabar, Inc. v. Long Bow Grp., Inc.*, 82 Mass. App. Ct. 648, 665-66 (2012).

Invoking the same arguments made for the Lanham Act claim, Olivet contends that Sterilite's trade dress is not distinctive. Having already concluded that Sterilite has provided sufficient evidence that the trade dress of its cabinets and drawers is distinctive or, in other words, has acquired secondary meaning, the Court similarly denies Olivet's motion for summary judgment on Sterilite's state-law dilution claim as to those products. *See Bern*, 2013 WL 2149674, at *5 (denying summary judgment on state law trade dress claims because the federal law analysis "applies with equal force" to those claims); *Santander Consumer USA Inc. v. Walsh*, 762 F. Supp. 2d 217, 232-33 (D. Mass. 2010) (denying summary judgment on the chapter 110H claim because there was "sufficient" evidence of distinctiveness and dilution). The motion will be granted, however, as to Sterilite's wastebasket lids because, as explained, they have not acquired secondary meaning.

## IV.    Common Law Unfair Competition Claim.

Olivet likewise seeks judgment on Sterilite's common law unfair competition claim on the same grounds as the federal Lanham Act claim. "In Massachusetts, the test for common law trademark infringement is the same as under the Lanham Act." *United Oil Heat, Inc. v. M.J. Meehan Excavating, Inc.*, 95 Mass. App. Ct. 579, 581-82 (2019). Given that "the common law trademark clai[m] in . . . Massachusetts . . . require[s] the same elements as the federal claim,"

*Bose Corp. v. Ejaz*, 732 F.3d 17, 26 n.7 (1st Cir. 2013) (citing *Jenzabar*, 82 Mass. App. Ct. at 654 n.11), Olivet's motion for summary judgment on this common law unfair competition claim will, for the same reasons as Sterilite's Lanham Act claim, be denied with respect to Sterilite's cabinets and drawers but granted as to Sterilite's wastebasket lids.

## V.     Tortious Interference with Business Relationships Claim.

Finally, Olivet seeks judgment on Sterilite's claim for tortious interference with business relationships. To prevail on that claim, Sterilite must establish that (1) it had a business relationship with Walmart; (2) Olivet "knowingly induced a breaking of the relationship"; (3) Olivet's "interference with the relationship, in addition to being intentional, was improper in motive or means"; and (4) Sterilite was harmed by Olivet's actions. *Blackstone v. Cashman*, 448 Mass. 255, 260 (2007). While conceding that Sterilite had a business relationship with Walmart, Olivet argues that it did not interfere with that relationship, let alone act with improper motive or means.

Viewing the facts in the light most favorable to Sterilite as the non-moving party, however, a reasonable jury could find in Sterilite's favor on all four elements. Olivet first places the blame entirely on Sterilite for the deterioration of its relationship with Walmart by pointing to Sterilite's production issues during the COVID-19 pandemic. ECF 115, ¶ 260; ECF 135, at 6:8-13. But Olivet ignores evidence suggesting that it may also have played a role. Olivet admits, for example, that it discussed with Walmart "gaining space in Walmart stores in place of" Sterilite's drawers and cabinets. ECF 114, at 29. Walmart also kept Sterilite as its supplier until Olivet's products were available for purchase. ECF 115, ¶ 307; ECF 121, ¶ 332. Thus, at a minimum, a genuine dispute exists about whether Walmart would have continued buying Sterilite's products without Olivet's versions of those same products.

Olivet next argues that it did not act with an improper purpose or use improper means because it simply sought to compete for Walmart's business and did not violate any law. Under Massachusetts law, "improper means refers to whether the defendant 'violated a statute or a rule of common law[,] . . . used threats, misrepresented any facts, defamed anyone, or used any other improper means' in interfering with the business relationship." *Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 540 (1st Cir. 2023) (quoting *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 817 (1990)). Given that the claims for trade dress infringement under the Lanham Act, dilution pursuant to M.G.L. c. 110H, § 13, and common law unfair competition have survived summary judgment as to Sterilite's cabinets and drawers, a reasonable jury could conclude that Olivet engaged in improper means by violating these provisions. Olivet's motion for summary judgment on Sterilite's claim for tortious interference with a business relationship is, accordingly, denied.

## CONCLUSION AND ORDER

For the foregoing reasons, Olivet's motion for summary judgment (ECF 102) on Sterilite's claims for trademark infringement under the Lanham Act, dilution pursuant to M.G.L. c. 110H, § 13, and common law unfair competition is DENIED with respect to Sterilite's 2-shelf and 4-shelf storage cabinets and 4-drawer storage units, and GRANTED with respect to Sterilite's 11-gallon and 13-gallon wastebasket lids. The motion for summary judgment is DENIED with respect to the tortious interference claim.

Olivet's motion to exclude three of Sterilite's expert opinions (ECF 106) is DENIED.

Sterilite's motion to exclude certain portions of Olivet's three expert opinions (ECF 109) is GRANTED in part and DENIED in part. Olivet's damages expert, Juli Saitz, will not be permitted to testify about the cause of Sterilite's damages, and Olivet's design expert, Paul Hatch,

will not be permitted to testify about the functionality of Sterilite's overall trade dress. Sterilite's motion is otherwise DENIED.

The parties' identical sealed motions to exclude (ECF 66 and 80) and Olivet's identical sealed motion for summary judgment (ECF 64) are DENIED as moot. *See* ECF 101.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: September 30, 2024