## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ )<br><br>STERILITE CORPORATION, )<br> )<br>    Plaintiff, )<br> )<br>v. )<br> )<br>OLIVET INTERNATIONAL, INC., )<br> )<br>    Defendant. )<br>_____) | No. 1:22-cv-10327-JEK |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DILUTION CLAIM AND MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR A PERMANENT INJUNCTION AND DEFENDANT'S MOTION TO SUPPLEMENT

**KOBICK, J.**

After a nine-day trial in April 2025, the jury found that defendant Olivet International, Inc. willfully infringed plaintiff Sterilite Corporation's trade dress in its storage cabinets and drawers and tortiously interfered with Sterilite's business relationship with Walmart, Inc. The jury also rendered an advisory verdict finding that Sterilite proved by a preponderance of the evidence that Olivet diluted the value of Sterilite's trade dress in its cabinets and drawers. Based on the findings of fact and conclusions of law that follow, and consistent with the advisory verdict, Sterilite is entitled to judgment on its claim under M.G.L. c. 110H, § 13 because it adequately proved at trial that Olivet diluted the value of Sterilite's trade dress in its cabinets and drawers. Also pending before the Court are Sterilite's motion for a permanent injunction pursuant to Federal Rule of Civil Procedure 65(d), 15 U.S.C. § 1116, and M.G.L. c. 110H, § 13 and Olivet's motion to supplement the record. For the reasons to be explained, Olivet's motion will be granted and Sterilite's motion will be granted in part and denied in part. The permanent injunction will cover Olivet's affiliates, parents, and wastebasket lids, but will exclude any reference to Sam's Club.

# FINDINGS OF FACT

## I.   The Parties and Asserted Trade Dress.

Sterilite manufactures plastic consumer products, including a 2-shelf storage cabinet, 4-shelf storage cabinet, and 4-drawer storage unit.[1] Sterilite's asserted trade dress for the cabinets consists of (1) rectangular handles that taper in width from the top center of the unit to the side of the unit; (2) doors that have a curved inset profile; (3) side panels with their own inset profile; and (4) back panels with a geometric inset pattern, along with the shape and appearance of the products as a whole.[2] Sterilite's claimed trade dress for the drawers similarly consists of (1) top and bottom panels that have outward curved leading edges; (2) handles that have downward curved leading edges; and (3) drawers that have curved front faces, along with the shape and appearance of the product as a whole.[3]

Olivet distributes consumer products, including plastic goods, that are manufactured by Ecotech Consumer Products, LLC.[4] FTI Group (Holding) Company Limited ("Fair Trade") owns both Olivet and Ecotech and procures injection molds for them from a third party in Taiwan or China.[5]

---

[1] ECF 219-1, at 29:10-2-30:1, 33:16-34:13 (Stone). Sterilite also manufactures 11-gallon and 13-gallon wastebasket lids, but as will be explained, the Court granted summary judgment to Olivet on Sterilite's dilution claim under M.G.L. c. 110H, § 13 with respect to those lids. *See* ECF 137.

[2] ECF 219-1, at 107:1-109:9 (Benham).

[3] *Id.* at 109:11-110:13 (Benham).

[4] ECF 222, at 110:7-112:16 (Overbey).

[5] *Id.* at 5-127:10-25 (Overbey); ECF 221, at 162:9-20 (Lin).

As relevant here, Olivet and Sterilite both sell plastic products to Walmart, a national retailer of consumer products.[6] Since September 2021, Olivet has sold its 2-shelf storage cabinet, 4-shelf storage cabinet, and 4-drawer storage unit to Walmart, for resale under Walmart's private label brand name "Hyper-Tough."[7] Olivet's Chief Executive Officer, Terry Muldoon, and its Chief Growth Officer, Megan Overbey, admitted at trial to intentionally copying the design of Sterilite's cabinets and drawers in order to produce its own versions.[8]

## II.    Non-Functionality of Sterilite's Claimed Trade Dress.

Sterilite chose, among dozens of options, to design its 4-drawer unit and 4-shelf and 2-shelf cabinets with certain features, including inset side panels, tapering handles, and curved and inset doors.[9] Cost was not a factor in selecting those features, which were either cost-neutral or incrementally more expensive than alternatives.[10] Sterilite's Vice President of Engineering, Paul Benham, testified that these features do not make its cabinets and drawers "function better" for their intended purpose; rather, these features are aesthetic "design choice[s]."[11] Sterilite's product design expert, David Adriaansen, concurred.[12] Cabinets from competitors Rubbermaid, Keter, and Suncast, as well as drawers from competitors Mainstays and Litfad, similarly have features like

---

[6] ECF 219-1, at 48:25-49:7 (Stone); ECF 222, at 59:9-14 (Rinke); *id.* at 113:15-114:5 (Overbey).

[7] ECF 222, at 22:20-23:1 (Rinke); *id.* at 120:19-121:1 (Overbey); ECF 219-1, at 37:2-17 (Stone).

[8] ECF 223, at 23:1-16, 35:7-10 (Overbey); ECF 225, at 72:15-73:2 (Terry Muldoon).

[9] ECF 219-1, at 110:17-111:21, 112:12-20, 114:6-13, 115:10-17, 116:15-24, 117:10-17, 118:9-16, 119:8-10 (Benham).

[10] *Id.* at 111:25-112:5, 113:9-15, 114:14-20, 116:4-9, 117:23-118:1, 118:20-24, 119:14-17 (Benham).

[11] *Id.* at 111:22-24; 112:21-113:4; 114:21-24; 116:4-6; 117:18-22; 118:17-24; 119:11-17 (Benham).

[12] ECF 221, at 121:8-128:13 (Adriaansen).

handles, doors, and panels that perform the same function as those in Sterilite's cabinets and drawers but look aesthetically different than Sterilite's asserted trade dress and in their overall design.[13] Olivet copied Sterilite's cabinets, even though it was aware at the time of alternative designs by Rubbermaid, Keter, and Titan, among others.[14]

Adriaansen acknowledged that the drawers' curved front, the cabinet doors' curved inset profile, and the cabinets' inset side and back panels may reduce warping in the manufacturing process.[15] Olivet's design expert, Paul Hatch, similarly observed that the curved inset profile of the cabinet doors provides strength and structure and that the drawers' outward curvature adds volume to the drawer.[16] Hatch further testified that the size and length of the handles on Sterilite's cabinets and drawers allows consumers to grip the products more easily.[17]

## III.    Secondary Meaning and Likelihood of Dilution of Sterilite's Proposed Trade Dress.

Sterilite began selling its 2-shelf and 4-shelf cabinets in 1998 and its drawers in 2003.[18] Since 2018, Sterilite has generated roughly $67 million from selling approximately 1.3 million total units of its cabinets and drawers.[19] Sterilite's cabinets and drawers have been sold in stores and online by large retailers like Walmart and Home Depot.[20] Nearly 75% of Sterilite's sales of those products occur in stores rather than online.[21] Olivet's cabinets and drawers are similarly

---

[13] *Id.* at 120:13-122:25, 123:8-124:20, 125:5-128:13 (Adriaansen).

[14] ECF 219-1, at 132:22-134:5 (Michael Muldoon); Trial Ex. 91.

[15] ECF 221, at 143:23-144:6, 150:3-14, 151:17-21 (Adriaansen).

[16] ECF 223, at 48:22-50:5, 51:24-52:10 (Hatch).

[17] *Id.* at 48:5-17, 51:10-24 (Hatch).

[18] ECF 219-1, at 35:7-14 (Stone).

[19] *Id.* at 167:2-8 (Ahern).

[20] *Id.* at 36:11-23 (Stone); ECF 220, at 136:16-137:10 (O'Shea).

[21] ECF 220, at 155:12-17 (O'Shea).

priced and are sold in the same section as Sterilite's products were at Walmart and on Walmart.com.[22] Sterilite and Olivet identify each other as competitors in the market and share the same consumers: those shopping for plastic cabinets and drawers.[23] Typical consumers of plastic housewares products do little research on these types of products before making purchasing decisions.[24]

Sterilite has extensively advertised and promoted the trade dress of its cabinets and drawers online, in print, in stores, through search engine optimization, and across social media platforms like Facebook, Instagram, and X (formerly known as Twitter).[25] Sterilite's website displays the overall design of its cabinets and drawers and highlights their aesthetic features, including the "simplicity" of their design.[26] Sterilite similarly presents the overall design of those products on social media.[27] For example, in June 2022, Sterilite posted a photo of the drawer unit on Facebook, highlighting it as "heavy-duty" and "sleek."[28]

Sterilite has spent $30 million in the past five years on accrual advertising for all of its products, not just its cabinets and drawers.[29] In this context, accrual advertising is a form of advertising whereby a manufacturer pays its retailers to distribute advertisements for the manufacturer's products.[30] Olivet likewise uses accrual advertising, including at Walmart and on

---

[22] *Id.* at 149:7-17, 155:3-22 (O'Shea).

[23] ECF 219-1, at 36:24-37:3 (Stone); *id.* at 132:13-15 (Michael Muldoon); ECF 220, at 103:21-104:4 (Overbey); *id.* at 155:12-17, 156:7-10 (O'Shea).

[24] ECF 220, at 156:2-6 (O'Shea).

[25] ECF 219-1, at 149:10-14, 154:1-12, 157:1-159:1, 162:17-24 (Ahern).

[26] *Id.* at 150:20-151:3, 151:20-152:4 (Ahern); Trial Exs. 92, 93.

[27] ECF 219-1, at 162:19-24, 164:17-165:2, 165:23-166:9 (Ahern); *see* Trial Exs. 96, 97.

[28] Trial Ex. 59; *see* ECF 219-1, at 164:11-16 (Ahern).

[29] ECF 219-1, at 153:7-11 (Ahern); ECF 220, at 131:1-2 (O'Shea).

[30] ECF 219-1, at 153:3-6 (Ahern); ECF 220, at 131:8-25 (O'Shea).

Walmart.com, to advertise its products.[31] Between 2011 and 2020, Sterilite also paid approximately $40,000 per year to advertise in HomeWorld Business, a print trade magazine.[32] When searching online for Sterilite's products, Olivet's Hyper Tough products, among other items, appear; conversely, Sterilite's products appear when searching online for Olivet's products.[33]

To promote brand recognition, Sterilite consistently uses simple, sleek, elegant, sculpted, and soft designs.[34] The similar "family look" of its cabinet and drawers allows them to present well together—including on the store floor, in print advertisements, and on social media—and permits consumers to associate them with a single source.[35] Sterilite's advertisements featuring its cabinets and drawers together also promote brand awareness by creating a "halo effect" over the brand, whereby customers satisfied with the cabinets will purchase the drawers or vice versa.[36] In the plastic housewares industry, products like storage cabinets and drawers typically do not employ the same design for over twenty years.[37]

Olivet intentionally copied Sterilite's cabinets and drawers in order to create its own replicas.[38] It sought "to follow [Sterilite's] spec detail exactly" in order "to replace Sterilite" at Walmart with its own knock-off products after Walmart "asked [it] to provide these products because [Walmart] liked the look of Sterilite's products."[39] Olivet's copying was precise enough

---

[31] ECF 220, at 152:1-6 (O'Shea).

[32] ECF 219-1, at 160:22-162:16 (Ahern); ECF 220, at 131:2-3 (O'Shea).

[33] ECF 220, at 150:7-154:22 (O'Shea); Trial Exs. 119-121.

[34] ECF 219-1, at 107:1-4, 111:9-14 (Benham); *id.* at 147:4-9 (Ahern).

[35] *Id.* at 108:14-25, 115:25-116:3 (Benham); *id.* at 162:2-8 (Ahern); ECF 220, at 127:12-18, 135:24-136:6 (O'Shea); *see* Trial Exs. 92, 93.

[36] ECF 219-1, at 156:13-25 (Ahern); ECF 220, 127:19-24 (O'Shea).

[37] ECF 220, at 130:3-12 (O'Shea).

[38] ECF 223, at 23:1-16, 35:7-10 (Overbey); ECF 225, at 72:15-73:2 (Terry Muldoon).

[39] ECF 222, at 120:2-18, 139:18-23, 152:18-21 (Overbey); ECF 223, at 27:6-9 (Overbey).

that the parts for its cabinets and drawers are interchangeable with Sterilite's component parts.[40] Despite Olivet's admitted copying, its cabinets and drawers are inferior in quality because, among other issues, its products have warped or distorted parts and a lesser finish.[41] While Olivet's products are labeled "Hyper Tough" on the box, sticker, website, and instructions, Sterilite's products are labeled "Sterilite."[42]

On Walmart's website, Sterilite's 4-shelf cabinet has a 4.5-star rating and Olivet's knock-off cabinet has a 3.4-star rating, both based on over 1,000 reviews.[43] One review of Olivet's 4-shelf cabinet on Walmart.com from May 2022, for example, noted: "The plastic molding it's made of is badly warped. It was easy for me to put together because I bought two when they were made by sterilite last year. The ones from sterilite work fantastic. These are horribly warped and I had to use a lock, not to keep the cabinet locked, but to keep the doors closed."[44] Olivet's customer call logs similarly reflect that it received more frequent complaints, including grievances about broken parts, directed at the disputed cabinets and drawers than other products.[45]

Some customers who purchased Olivet's products posted negative reviews that expressed confusion about whether the products were made by Sterilite.[46] In September 2022, for instance, a review on Sterilite's website for its 4-shelf cabinet stated: "I bought 3 of them about 2 yrs ago

---

[40] ECF 219-1, at 168:6-2-170:12 (Ahern); Trial Exs. 98, 99.

[41] ECF 221, at 107:19-113:21 (Adriaansen); ECF 219-1, at 121:2-16 (Benham); ECF 220, at 170:17-171:12 (O'Shea).

[42] ECF 219-1, at 70:5-73:17 (Stone); *see* Trial Exs. 27, 32, 37, 85, 86, 103, 110.

[43] ECF 220, at 176:1-177:21 (O'Shea).

[44] Trial Ex. 122, at 5; ECF 220, at 160:1-161:6 (O'Shea).

[45] ECF 220, at 168:19-170:16 (O'Shea); ECF 219-1, at 136:22-139:23 (Michael Muldoon); *see* Trial Ex. 116.

[46] *See* ECF 242, § I.C.6, ¶¶ 43-54.

and they are great . . . so I bought 3 more this summer and these ones are not holding up like the others . . . [s]o disappointed and mad how cheaply these ones were made compared to the first set I bought. I got them at Walmart."[47] Another customer left a one-star review for that same product on Amazon.com in March 2022, explaining that she "purchased 2 of these in 2020, and they were great," but that "[t]hese units were warped out of the box and extremely difficult to assembl[e]."[48] That customer also submitted a photo revealing that the complained-of product was actually made by Olivet.[49] Another wrote a one-star review of Sterilite's drawers on its website in January 2023 titled "Sterilite + Walmart = Hyper Tough," observing that the product "looks ugly, shows dust easier, & doesn't work in any room of my home" and "wish[ing] Sterilite much profitability in their venture with Walmart's Hyper Tough private labeling."[50] Sterilite's plastics expert, George O'Shea, testified that these examples, among others, represent the tip of the "iceberg" of consumer confusion between Sterilite's cabinets and drawers and those made by Olivet, because only a small fraction of customers actually posts reviews.[51]

Despite these examples of consumer confusion, Olivet submitted surveys by its expert, Dr. H. Tolga Bilgicer, showing net recognition levels for Sterilite's 4-shelf cabinet and 4-drawer unit that were insufficient to demonstrate the existence of secondary meaning.[52] Net recognition levels measure the percentage of people who associate a certain product with a particular company or

---

[47] Trial Ex. 79; ECF 219-1, at 51:16-52:19 (Stone).

[48] Trial Ex. 81, at 1; ECF 219-1, at 56:11-25 (Stone).

[49] ECF 219-1, at 57:3-8 (Stone); *see* Trial Ex. 81, at 2.

[50] Trial Ex. 80; ECF 219-1, at 54:8-55:3 (Stone).

[51] ECF 220, at 157:7-22 (O'Shea).

[52] ECF 223, at 118:22-119:5, 123:8-14 (Bilgicer).

single source.[53] Bilgicer calculated those levels by taking the percentage of survey respondents who associated Sterilite's cabinet or drawers with Sterilite or a single source (the test group) and subtracting the percentage of survey respondents who associated the control product with Sterilite or a single source (the control group).[54] The net recognition, based on the percentage of people who associated the cabinet and drawers with Sterilite, equaled 0% and 9.6%, respectively.[55] Likewise, the net recognition based on the percentage of people who associated the cabinet and drawers with a single source was 0% and 6.9%, respectively.[56] Sterilite's expert, Dr. Melissa Pittaoulis, criticized Dr. Bilgicer's survey methodology for, among other issues, violating the established "anonymous source" rule,[57] using images that improperly omitted certain elements of Sterilite's trade dress, and employing improper controls.[58]

## PROCEDURAL HISTORY

Sterilite brought this action against Olivet in March 2022. ECF 1. The complaint asserts claims for trade dress infringement, in violation of the Lanham Act, 15 U.S.C. § 1125(a) (Count I); unfair competition, in violation of M.G.L. c. 93A, § 11 (Count II); dilution, in violation of M.G.L. c. 110H, § 13 (Count III); common law unfair competition (Count IV); and tortious interference with business relationships (Count V). *Id.* ¶¶ 47-76. The Court denied Olivet's motion

---

[53] *Id.* at 139:10-146:7 (Bilgicer).

[54] *Id.* at 127:7-140:22 (Bilgicer); ECF 221, at 39:2-8 (Pittaoulis).

[55] ECF 223, at 139:21-146:7 (Bilgicer).

[56] *Id.*

[57] This rule "requires . . . that consumers view the design as indicating that the product comes from a *single* source, even if they cannot name the source in question." *Straumann Co. v. Lifecore Biomedical Inc.*, 278 F. Supp. 2d 130, 137 (D. Mass. 2003).

[58] ECF 221, at 44:11-61:13 (Pittaoulis); *see* ECF 242, § I.C.7, ¶¶ 58-63.

to dismiss the complaint for failure to state a claim in July 2022. ECF 22. Sterilite later withdrew its Chapter 93A claim. *See* ECF 103, at 1 n.1; ECF 135, at 30:9-11.

In September 2024, the Court denied Olivet's motion for summary judgment on Sterilite's claims for trade dress infringement under the Lanham Act, dilution pursuant to M.G.L. c. 110H, § 13, and common law unfair competition with respect to Sterilite's cabinets and drawers, but granted the motion on those claims with respect to Sterilite's 11-gallon and 13-gallon wastebasket lids. ECF 137. The Court also denied the motion as to Sterilite's tortious interference claim. *Id.* After denying Olivet's motion for reconsideration, ECF 146, the Court clarified in February 2025 that Sterilite's wastebasket lids remain relevant to its tortious inference claim because the wastebasket lids bear on "whether Sterilite 'was harmed by [Olivet's] actions,'" ECF 155 (quoting *Blackstone v. Cashman*, 448 Mass. 255, 260 (2007)).

Ahead of trial, the Court notified the parties that it would empanel an advisory jury on the dilution claim, for which only equitable relief was available. ECF 188. Following nine days of trial in April 2025, the jury determined that Olivet willfully infringed Sterilite's trade dress and engaged in common law unfair competition as to the cabinets and drawers, and that Olivet tortiously interfered with Sterilite's business relationship with Walmart. ECF 216. It awarded Sterilite $11 million for the trade dress infringement and common law unfair competition claims. *Id.* at 2. For the tortious interference claim, the jury awarded $5.2 million, a sum that excluded damages related to the cabinets and drawers. *Id.* at 3. The jury also rendered an advisory verdict finding that Sterilite had proven by a preponderance of the evidence that Olivet diluted the value of Sterilite's trade dress in its cabinets and drawers. *Id.* at 2.

## CONCLUSIONS OF LAW

The Massachusetts anti-dilution statute entitles the holder of trade dress to injunctive relief if there is a "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a [design]." M.G.L. c. 110H, § 13; *see Bern Unlimited, Inc. v. Burton Corp.*, 95 F. Supp. 3d 184, 212 (D. Mass. 2015). To prevail on its claim under this statute, Sterilite must show that (1) its trade dress is non-functional, (2) its trade dress has acquired secondary meaning, and (3) Olivet's use of similar trade dress has created a likelihood of dilution. Mass. Superior Ct. Jury Instructions §§ 15.2.25, 15.3.6 (2018); *see Jenzabar, Inc. v. Long Bow Grp., Inc.*, 82 Mass. App. Ct. 648, 665-66 (2012); *Astra Pharm. Prod., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1209 (1st Cir. 1983) (examining identical predecessor statute, M.G.L. c. 110B, § 12); *see also Bern Unlimited, Inc. v. Burton Corp.*, No. 11-cv-12278-FDS, 2013 WL 2149674, at *5 (D. Mass. May 15, 2013) (claim under M.G.L. c. 110H, § 13 "include[s] the requirement that the claimed trade dress be non-functional").

The jury rendered an advisory verdict finding that Sterilite proved by a preponderance of the evidence that Olivet diluted the value of Sterilite's trade dress for the 2-shelf cabinet, 4-shelf cabinet, and 4-drawer unit. ECF 216, at 2. But because "[t]he responsibility for the decision-rendering process remains with the trial judge," the Court has "discretion whether to accept or reject, in whole or in part, the verdict or findings of the advisory jury" with respect to this claim. *Reyes v. Garland*, 26 F.4th 516, 521 (1st Cir. 2022) (quotation marks omitted). The parties agree that the jury's verdict is "entitled to some deference." *Momenta Pharms., Inc. v. Amphastar Pharms., Inc.*, 298 F. Supp. 3d 258, 264 (D. Mass 2018); *see* ECF 242, § II, ¶ 3; ECF 257, § II, ¶ 2. For the reasons that follow, and consistent with the jury's advisory verdict, Sterilite

sufficiently proved at trial that Olivet diluted the value of its trade dress for the cabinets and drawers.

## I.    **Non-Functionality.**

The parties agree that the analysis of functionality under the Lanham Act "applies with equal force" to a trade dress dilution claim under M.G.L. c. 110H, § 13. *Bern*, 2013 WL 2149674, at *5; *see* ECF 242, § II.B, ¶ 9; ECF 257, § II.B, ¶ 17. A product feature is, accordingly, "functional when it is essential to the use or purpose of the device or when it affects the cost or quality of the device." *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 33 (2001). In other words, a design is functional if "it is the reason the device works" or if its "'exclusive use . . . would put competitors at a significant non-reputation-related disadvantage.'" *Id.* at 32, 34 (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995)). "The crucial inquiry is into the effect that granting protection will have on the opportunity of others to compete." *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 37 (1st Cir. 1998). And the existence of alternative designs is "a relevant consideration in the functionality analysis." *SoClean, Inc. v. Sunset Healthcare Sols., Inc.*, 52 F.4th 1363, 1370 (Fed. Cir. 2022).

Sterilite has proven by a preponderance of the evidence that the trade dress of its cabinets and drawers is non-functional because those products' overall designs, and their individual elements in isolation, are arbitrary and unnecessary for the products to operate for their intended purpose. As Benham explained, Sterilite had dozens of options for the design of its cabinets and drawers, but it designed those products based on aesthetic look, not functionality. He testified, for instance, that the 4-shelf cabinet's tapering rectangular handle was a "design choice" that produces "a nice aesthetic edge," but it "could have been vertical, . . . oval, . . . [or] recessed."[59] The cabinet's

---

[59] ECF 219-1, at 107:1-13, 112:12-113:4 (Benham).

inset side panels, according to Benham, are also "soft" and "sculpted," while other cabinets are "traditionally . . . more linear."[60] And the drawers' curved front edge is aesthetically distinct because "most in the market" are "rectangular" or "very linear."[61]

Alternative designs for cabinets and drawers exist in the market. Competitors such as Rubbermaid, Keter, and Suncast have created cabinets, and Mainstays and Litfad have built drawers, that perform the same functions as Sterilite's products without adopting Sterilite's trade dress. Such alternative designs, as Olivet concedes, are probative of non-functionality because they "sugges[t] that the particular design used by [Sterilite] is not needed by competitors to effectively compete." McCarthy on Trademarks and Unfair Competition § 7:75 (5th ed.) ("McCarthy"); *see* ECF 257, § II.B, ¶ 19; *Hillside Plastics, Inc. v. Dominion & Grimm U.S.A., Inc.*, No. 17-cv-30037-MGM, 2018 WL 4537205, at *8 (D. Mass. Aug. 6, 2018) (considering "the availability of alternative designs"); *SoClean, Inc. v. Sunset Healthcare Sols., Inc.*, 554 F. Supp. 3d 284, 300 (D. Mass. 2021) (same and observing that the "Second, Fourth, Seventh, and Federal Circuits have similarly looked to alternative designs as important evidence of functionality"), *aff'd*, 52 F.4th 1363 (Fed. Cir. 2022).

True, certain features of Sterilite's cabinets and drawers serve a utilitarian function. The drawers' curved handles, for instance, allow consumers to open them. But to establish non-functionality, Sterilite need not prove that the "handle does not serve any function"; rather, it need only establish that "preventing competitors from copying [its] design would not significantly disadvantage them from producing . . . competitive and cost-efficient" cabinets and drawers. *Bodum USA, Inc. v. A Top New Casting Inc.*, 927 F.3d 486, 492 (7th Cir. 2019). While such

---

[60] *Id.* at 107:15-18 (Benham).

[61] *Id.* at 109:21-110:9 (Benham).

13

products "need *some* handle, there is no functional reason" to adopt Sterilite's particular handle design. *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, 986 F.3d 250, 257 (3d Cir. 2021) (citing *id.* at 492-93). Nor was evidence introduced at trial that protecting Sterilite's trade dress would prevent other companies from fairly competing in the market. *See Lund*, 163 F.3d at 37. As Benham testified, Sterilite's design choices were either cost-neutral or incrementally more expensive than alternative designs.

Moreover, even if, as Olivet contends, all the features of Sterilite's cabinets and drawers were functional in isolation, the overall design of those products is non-functional when considered as a whole. "The fact that a product contains some functional elements does not" preclude protection, for even a "'particular arbitrary combination of functional features, the combination of which is not itself functional, properly enjoys protection.'" *Lund*, 163 F.3d at 37 (quoting *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1119 (5th Cir. 1991), *aff'd*, 505 U.S. 763 (1992)); *see Yankee Candle Co. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 39 n.8 (1st Cir. 2001) ("[A] combination of functional elements may itself be entitled to trade dress protection."). Benham and Adriaansen credibly testified that Sterilite's cabinets and drawers are the product of arbitrary and aesthetic design choices. Olivet does not point to any contradictory evidence.

Accordingly, the trade dress of Sterilite's cabinets and drawers is non-functional. This conclusion is consistent with the jury's finding in favor of Sterilite on its trade dress infringement claim. *See* ECF 216, at 1-2. The jury was instructed that Sterilite's trade dress "is non-functional for purposes of [the dilution] claim for the same reasons that it would be for purposes of the trade dress infringement claim," so if it found that Sterilite's cabinets and drawers "are non-functional for purposes of the trade dress infringement claim, then [it] should find [this] elemen[t] of Sterilite's dilution claim also met." ECF 226, at 8-117:2-13. While Olivet contests the jury's

factual finding on non-functionality for Sterilite's dilution claim, it has not otherwise challenged the jury's verdict on Sterilite's trade dress infringement claim. The jury's finding of non-functionality is, as the parties acknowledge, entitled to deference. ECF 242, § II, ¶ 3; ECF 257, § II, ¶ 2; *see SoClean*, 554 F. Supp. 3d at 302 ("'Functionality . . . is a question of fact that, like other factual questions, is generally put to a jury[.]'" (quoting *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014))).

## II.    <u>Secondary Meaning.</u>

In addition to establishing non-functionality, Sterilite "must show that its [trade dress] is distinctive"—that is, it has acquired secondary meaning. *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 493-494 (1st Cir. 1981) (examining identical predecessor statute, M.G.L. c. 110B, § 12); *see United Oil Heat, Inc. v. M.J. Meehan Excavating, Inc.*, 95 Mass. App. Ct. 579, 590 n.16 (2019) (quoting *id.*). The parties, once again, agree that the analysis of secondary meaning under the Lanham Act applies to Sterilite's dilution claim under M.G.L. c. 110H, § 13. *See Bern*, 95 F. Supp. 3d at 212; ECF 242, § II.A, ¶¶ 4-5; ECF 257, § II.A, ¶ 3. Direct evidence of secondary meaning—typically in the form of "consumer surveys and testimony by individual consumers"—is therefore valuable but not required. *Yankee Candle*, 259 F.3d at 43. Circumstantial evidence is also probative of secondary meaning, and courts may look to a number of factors, including "proof of intentional copying," "the nature and extent of advertising and promotion of the trade dress," "the length and manner of the use of the trade dress," "the product's 'established place in the market,'" "the efforts made to promote a conscious connection by the public between the trade dress and the product's source," and evidence of actual customer confusion. *Id.* at 43-45 (quoting *Lund*, 163 F.3d at 42); *accord Castricone v. Mical*, 74 Mass. App. Ct. 591, 594 (2009) ("The acquisition of secondary meaning is a question of fact" that requires consideration of "a

'variety of factors,'" including "the length of use . . . , similarity of products, . . . 'and evidence of actual confusion.'" (quoting *Planned Parenthood Fed'n of Am., Inc. v. Problem Pregnancy of Worcester, Inc.*, 398 Mass. 480, 486 (1986))).

Based on the totality of Sterilite's circumstantial evidence and Olivet's direct survey evidence, Sterilite established by a preponderance of the evidence that the trade dress of its cabinets and drawers has acquired secondary meaning. Sterilite has earned $67 million in revenue from selling its cabinets since 1998 and its drawers since 2003. This evidence reflects the products' established place in the market and Sterilite's lengthy use of the products' trade dress. *See A. Simon & Sons, Inc. v. Simonfurniture Int'l, Inc.*, No. 21-cv-11254-PBS, 2021 WL 6144611, at *4 (D. Mass. Nov. 19, 2021) (granting preliminary injunction where the plaintiff had used its mark for fourteen years); *Shames v. Coontz*, 882 F. Supp. 1173, 1174 (D. Mass. 1995) (same where plaintiffs had "used their name steadily for 16 years with apparent considerable success").

The nature and extent of Sterilite's advertising further supports a finding of secondary meaning. Sterilite has spent, albeit not only for its cabinets and drawers, $30 million on accrual advertising in the past five years and approximately $40,000 per year on its print advertising between 2011 and 2020. *See President & Trustees of Colby Coll. v. Colby Coll.-New Hampshire*, 508 F.2d 804, 808 (1st Cir. 1975) ("[T]he normal consequence of substantial publicity may be inferred."). On its website, Sterilite highlights the cabinets' and drawers' aesthetic features, such as the "simplicity" of their design.[62] Sterilite likewise presents their overall design on social media, including an emphasis on the "heavy-duty, sleek drawer unit."[63] Given that the asserted trade dress comprises the shape and appearance of the cabinets and drawers as a whole, such advertising

---

[62] ECF 219-1, at 150:20-152:4 (Ahern); Trial Exs. 92, 93.

[63] Trial Ex. 59; *see* ECF 219-1, at 164:11-16 (Ahern).

properly "'featur[es]' the relevant aspect[s] of the product[s]" and "direct[s] the consumer to those features claimed as trade dress." *Yankee Candle*, 259 F.3d at 44. Sterilite's conscious effort to maintain a consistent look across its products also allows consumers to associate them with a single source. *See* McCarthy § 15:8 ("[S]econdary meaning exists when the ordinary buyer of these goods or services associates the designation with a single, albeit anonymous, source.").

Further supporting secondary meaning is the evidence of customer confusion between Sterilite's cabinets and drawers and those of Olivet. One customer complaining of warped parts, for example, left a negative review for Sterilite's 4-shelf cabinet but attached a photo of Olivet's knock-off cabinet. Another customer complained that Sterilite's drawers were "ugly" and "show[ed] dust easier" but had purchased a Hyper-Tough product.[64] Such reviews provide "at least *some* evidence that consumers associate the trade dress with the source"—that is, Sterilite. *Yankee Candle*, 259 F.3d at 44. While Olivet characterizes this "handful of product reviews" as "sporadic, anecdotal evidence," ECF 257, § II.A, ¶ 12, O'Shea testified that, based on the "iceberg principle," they likely represent complaints from many other customers who do not post reviews. The evidence of actual consumer confusion therefore weighs in favor of secondary meaning.

Overbey and Muldoon both admitted to copying the designs of Sterilite's products. The fact that Olivet sought to copy Sterilite's cabinets and drawers exactly and replace those products at Walmart indicates that Olivet "was not merely 'imitating the successful features' of [Sterilite's] design, but 'intend[ing] to deceive purchasers as to the source of the product.'" *SoClean*, 554 F. Supp. 3d at 306 (quoting *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 124 (2d Cir. 2001)). It also suggests that Olivet sought to capitalize on Sterilite's good name by "attempting to mislead consumers into believing that its [products] were" Sterilite's, *id.*, based on

---

[64] Trial Ex. 80; ECF 219-1, at 54:8-55:3 (Stone).

its "belief that [Sterilite's] trade dress ha[d] acquired secondary meaning," *Yankee Candle*, 259 F.3d at 45 (citing *Blau Plumbing, Inc. v. S.O.S. Fix-it, Inc.*, 781 F.2d 604, 611 (7th Cir. 1986)). In *Yankee Candle*, the First Circuit found that "the evidence of copying was [not] sufficiently probative of secondary meaning" because the defendant "prominently displayed its trade name on its candles." *Id.* But the trial evidence showed that Olivet's labelling of its products with Walmart's private brand, Hyper-Tough, was insufficient to prevent consumer confusion as to the source of those products. *See Boston Bos. Athletic Ass'n v. Sullivan*, 867 F.2d 22, 34 (1st Cir. 1989) (finding "it fair to presume that purchasers [were] likely to be confused about the shirt's source" because "defendants intentionally referred to the Boston Marathon on its shirts" and "purchasers were likely to buy the shirts precisely because of that reference"); *Wenger S.A. v. Olivet Int'l.*, No. 20-cv-1107-AS, 2024 WL 36864, at *1 (S.D.N.Y. Jan. 3, 2024) ("a reasonable jury could find that consumers are likely to notice the logo on the front of the bag by itself" without seeing Olivet's "SwissTech" logo on the handle).

This circumstantial evidence favorable to a finding of secondary meaning for Sterilite's cabinets and drawers must be weighed against Olivet's consumer surveys showing the opposite. *See Yankee Candle*, 259 F.3d at 45. Those surveys reveal net recognition rates of 0% for the cabinets and less than 10% for the drawers, which fall well below the rates necessary to establish secondary meaning. *See Milk St. Cafe, Inc. v. CPK Media, LLC*, No. 16-cv-11416-DJC, 2017 WL 3425170, at *9 n.4 (D. Mass. Aug. 9, 2017) ("[G]enerally 'consumer recognition below 25% fails to establish secondary meaning.'" (quoting *Yankee Spirits, Inc. v. Gasbarro*, No. 96-cv-10967-PBS, 1998 WL 428092, at *9 (D. Mass. May 26, 1998))). Sterilite contends that Olivet's surveys "cannot be given *any* weight for purposes of assessing secondary meaning" because they contained "significant methodological flaws." ECF 242, § II.A, ¶ 7 (emphasis added). While the surveys are

entitled to weight notwithstanding their alleged methodological issues, they do not outweigh the circumstantial evidence of secondary meaning. *See* McCarthy § 32:178 ("It is notoriously easy for one survey expert to appear to tear apart the methodology of a survey taken by another." (citing, *inter alia*, *President & Trustees of Colby Coll*, 508 F.2d 804)); *Mark Bric Display Corp. v. Joseph Struhl Co.*, No. 98-cv-532-ML, 2003 WL 21696318, at *8 (D.R.I. July 9, 2003) (same).

The evidence regarding actual consumer confusion, Olivet's intentional copying, Sterilite's extensive advertising, the cabinets' and drawers' established place in the market, and their length and manner of use convince the Court that the products' trade dress has acquired a secondary meaning despite Olivet's contrary survey results. *See Yankee Candle*, 259 F.3d at 45. This determination is consistent with the jury's findings in favor of Sterilite on its trade dress infringement and dilution claims. *See* ECF 216, at 1-2. The jury was instructed that "direct and circumstantial [evidence] . . . may be given whatever weight [it], as the finde[r] of fact, deem[s] that particular evidence to be worth." ECF 226, at 8-99:2-4. The Court also instructed the jury that it should find the secondary meaning "elemen[t] of Sterilite's dilution claim . . . met" if it found that "Sterilite's cabinets and drawers have acquired secondary meaning . . . for purposes of the trade dress infringement claim." *Id.* at 8-117:2-13. While Olivet disputes the jury's factual finding on secondary meaning for Sterilite's dilution claim, it has not disputed the jury's verdict on Sterilite's trade dress infringement claim. The jury's finding of secondary meaning is, as the parties recognize, entitled to deference. ECF 242, § II, ¶ 3; ECF 257, § II, ¶ 2; *see Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 118 (1st Cir. 2006) ("The issue of distinctiveness ordinarily presents a question of fact.").

**III.    Likelihood of Dilution.**

Sterilite must establish likelihood of dilution by showing (1) "injury to the value of the [trade dress] caused by actual or potential customer confusion," (2) "injury resulting from use of the [trade dress] in a way that detracts from, draws on, or otherwise appropriates the goodwill and reputation associated with" its trade dress, or (3) "diminution in the uniqueness and individuality of" its trade dress. *Astra Pharm. Prods.*, 718 F.2d at 1209 (analyzing identical prior statute, M.G.L. c. 110B, § 12); *accord Santander Consumer USA Inc. v. Walsh*, 762 F. Supp. 2d 217, 232 (D. Mass. 2010). The parties agree that, to determine whether there has been actual or potential confusion, courts look to the same eight factors that "guide the inquiry into likelihood of confusion" under the Lanham Act. *Borinquen Biscuit Corp.*, 443 F.3d at 120; *see Hasbro, Inc. v. Clue Computing, Inc.*, 66 F. Supp. 2d 117, 137 (D. Mass. 1999), *aff'd*, 232 F.3d 1 (1st Cir. 2000) (applying likelihood of confusion Lanham Act standard to Massachusetts dilution claim); ECF 242, § II.C.1, ¶ 22; ECF 257, § II.C.1, ¶ 28. Those factors are: "(1) the similarity of the [trade dress]; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between of the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its [trade dress]; and (8) the strength of the plaintiff's [trade dress]." *US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 348 (1st Cir. 2024) (quotation marks omitted). "No one factor is necessarily determinative, but each must be considered." *Astra Pharm. Prods.*, 718 F.2d at 1205.

Based on these eight factors, Sterilite has demonstrated by a preponderance of the evidence that Olivet's cabinets and drawers have caused actual or potential consumer confusion and thus a

likelihood of dilution.[65] The parties' products and their associated trade dress are nearly identical because, as Olivet admitted, it intentionally copied Sterilite's designs. This marked similarity of the trade dress is "the most important factor" when, as here, the parties are "direct competitors." *Bos. Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 26 (1st Cir. 2008); *see* ECF 242, § II.C.1, ¶ 25; ECF 257, § II.C.1, ¶ 30. Olivet's use of the Hyper-Tough label does not change the otherwise virtually identical overall "visual appearance" of the parties' trade dress "in the context" of how their products "appea[r] to consumers." *Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro y Crédito Oriental*, 832 F.3d 15, 34 & n.24 (1st Cir. 2016) (quotation marks omitted). Indeed, the fact that customers have expressed confusion about whether Olivet's products were associated with Sterilite suggests that the label is not prominent. *See Yankee Candle*, 259 F.3d at 43 n.15 (lack of actual consumer confusion was "unsurprising" given that the alleged infringer "prominently display[ed] [its] trade name"). Customers have also complained to Sterilite about warped or distorted parts after purchasing Olivet's products. Olivet concedes that "Sterilite has submitted some evidence of actual confusion," ECF 257, § II.C.1, ¶ 32, which "'is often deemed the best evidence of possible future confusion,'" *D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, 111 F.4th 125, 133 (1st Cir. 2024) (quoting *Borinquen Biscuit Corp.*, 443 F.3d at 120).

Olivet's copying of Sterilite's trade dress also suggests, as discussed, that Olivet sought "to exploit [Sterilite's] reputation and goodwill" at Walmart and on Walmart.com, where Olivet's cabinets and drawers replaced Sterilite's products. *Dorpan, S.L. v. Hotel Melia, Inc.*, 728 F.3d 55, 68 (1st Cir. 2013). While Sterilite sells its products to retailers other than Walmart, both parties "targe[t] the same classes of prospective purchasers"—namely, those shopping for plastic cabinets

---

[65] Having so concluded, the Court need not reach Sterilite's two alternative bases for finding likelihood of dilution. *See* ECF 242, § II.C.2-.3, ¶¶ 28-34.

and drawers. *Star Fin. Servs., Inc. v. AASTAR Mortg. Corp.*, 89 F.3d 5, 10 (1st Cir. 1996). They also both utilize accrual advertising. The trade dress for Sterilite's cabinets and drawers is relatively strong because the design has been used for over two decades, is known in the households plastics industry, and has been extensively promoted through advertising. *See id.* at 11. Weighing these factors, Sterilite has established that Olivet's conduct diluted the value of Sterilite's trade dress due to actual or potential customer confusion.

In sum, Sterilite has proven by a preponderance of the evidence that its trade dress is non-functional and has acquired secondary meaning, and that Olivet's use of similar trade dress has created a likelihood of dilution. Having established a violation of the Massachusetts anti-dilution statute at trial, Sterilite is entitled to injunctive relief, which is discussed in the section that follows. *See* M.G.L. c. 110H, § 13 ("Likelihood . . . of dilution . . . shall be a ground for injunctive relief[.]").

## STERILITE'S MOTION FOR A PERMANENT INJUNCTION.

Sterilite moves for a permanent injunction pursuant to Federal Rule of Civil Procedure 65(d), 15 U.S.C. § 1116, and M.G.L. c. 110H, § 13. Olivet only partially opposes the motion. To obtain a permanent injunction, Sterilite "'must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between [it] and [Olivet], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). These factors have come to be known as the "*eBay* factors." "The first two factors together require 'a substantial injury that is not accurately measurable or adequately compensable by money damages.'" *Glob. NAPs, Inc. v. Verizon New England, Inc.*, 706 F.3d 8, 13 (1st Cir. 2013) (quoting *Ross-Simons of Warwick, Inc.*

*v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000)). A permanent "injunction should not be granted where 'a less drastic remedy' will suffice." *Greene v. Ablon*, 794 F.3d 133, 157 (1st Cir. 2015) (quoting *Monsanto*, 561 U.S. at 165-66).

The parties agree that Sterilite is entitled to a permanent injunction to remedy the harms caused by Olivet's infringement of Sterilite's trade dress in its cabinets and drawers. For the reasons outlined in Sterilite's memorandum, the Court concurs. Where the parties part ways is over the scope of the injunction. Sterilite has proposed permanently enjoining Olivet "and any of its *parents*, subsidiaries, successors, assigns, and *affiliates*, and all persons acting on behalf of or purporting to act on behalf of Olivet, including its officers, agents, servants, employees, and attorneys, and persons in active concert or participation with them" (1) "from using in commerce cabinet or drawer designs that are identical to, or confusingly similar to, Sterilite's 4-shelf cabinet design, 2-shelf cabinet design and/or 4-drawer unit design," and (2) "*from using Olivet's current 13 gallon and 11 gallon wastebasket [lid] designs, . . . or any substantially similar design, for sale to Walmart or Sam's Club.*" ECF 243-1, at 1-2 (emphases added). Contesting only the italicized portions of this proposed injunction, Olivet contends that the inclusion of Olivet's parents and affiliates, the wastebasket lids, and Sam's Club is overbroad.

## I.    Parents and Affiliates.

Under Federal Rule of Civil Procedure 65(d)(2), an injunction "binds only the following who receive actual notice of it by personal service or otherwise: (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in [paragraphs] (A) or (B)." Olivet argues that the proposed permanent injunction's inclusion of its "parents" and "affiliates" violates this rule. Sterilite counters that the inclusion of Olivet's parents and affiliates satisfies Rule 65(d)(2)(C)

23

because the evidence at trial established that these entities acted in concert with Olivet to infringe and dilute Sterilite's trade dress.

"Rule 65(d) 'is derived from the common-law doctrine that a decree of injunction not only binds the . . . defendant[s] but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control.'" *Golden State Bottling Co. v. N.L.R.B.*, 414 U.S. 168, 179 (1973) (quoting *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 14 (1945)). Under that doctrine, "defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *Regal*, 324 U.S. at 14. Any "persons in active concert or participation with [defendants] in the violation of an injunction" may be "brought within [the] scope of contempt proceedings by the rules of civil procedure." *Id.* Nonparties can be held liable in such proceedings if a court finds that they are either "'legally identified with th[e] defendant'" or "'deemed to have aided and abetted that defendant in the enjoined conduct.'" *Goya Foods, Inc. v. Wallack Mgmt. Co.*, 290 F.3d 63, 75 (1st Cir. 2002) (quoting *id.*); *accord G. & C. Merriam Co. v. Webster Dictionary Co.*, 639 F.2d 29, 35 (1st Cir. 1980). Nonparties are in "privity" or "legally identified" with the defendant if it is "fair to bind [them] . . . because [their] close alliance with the enjoined defendant adequately assures that [their] interests were sufficiently represented" in the original injunction proceeding. *Microsystems Software, Inc. v. Scandinavia Online AB*, 226 F.3d 35, 43 (1st Cir. 2000); *see* Charles A. Wright et al., 11A Fed. Prac. & Proc. Civ. § 2956 (3d ed.).

In Sterilite's view, the evidence admitted at trial sufficiently establishes that Olivet's parent company, Fair Trade, and its affiliate, Ecotech, are in privity with Olivet and actively participated in Olivet's infringement of Sterilite's trade dress. To support its contention that Olivet, Fair Trade, and Ecotech "act as one entity," ECF 244, at 16, Sterilite relies in part on Overbey's testimony that

"internally," those three entities "are just one company," ECF 222, at 110:14-21. Sterilite also invokes Overbey's testimony describing how Fair Trade helped create molds based on Sterilite's products provided by Olivet, and Ecotech manufactured Olivet's knock-off products using those molds, to argue that Fair Trade and Ecotech acted together with Olivet to infringe Sterilite's trade dress. *See* ECF 267, at 10-11.

But whether Fair Trade and Ecotech, as nonparties, fall within the reach of Rule 65(d)(2) as legally identified with Olivet or having aided and abetted Olivet in further infringement is a "fact-specific question" to be resolved in a subsequent contempt proceeding at which both non-party entities are present. *Microsystems Software*, 226 F.3d at 42; *see Lake Shore Asset Mgmt. Ltd. v. Commodity Futures Trading Comm'n*, 511 F.3d 762, 767 (7th Cir. 2007) (whether to apply Rule 65(d)(2) to a given entity "is a decision that may be made only after the [entity] in question is given notice and an opportunity to be heard"). The Supreme Court has made clear that "one is not bound by a judgment *in personam* resulting from litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110 (1969). As a result, courts err when enjoining a defendant's nonparty parent or affiliate by name absent such a contempt proceeding at which the parent or affiliate may present and contest evidence. *See id.* at 112; *Lake Shore*, 511 F.3d at 767 ("[E]ven a defendant's concession that some additional entity is the defendant's alter ego does not warrant an injunction against that entity, until it has been served with process and offered the opportunity to say whether it agrees with the original defendant's concession."); *cf. United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1136 (D.C. Cir. 2009) (discussing when a subsidiary falls within the scope of an injunction against its parent).

The proposed injunction does not purport to restrict Fair Trade or Ecotech by name. And contrary to Olivet's argument, the proposed injunction's inclusion of Olivet's nonparty "parents" and "affiliates" is appropriate because those terms do not inevitably refer to Fair Trade or Ecotech. *See Lake Shore*, 511 F.3d at 766 (injunction "binds" but cannot name "all those acting in concert with" defendant, including "other members of the corporate group" and its "affiliates"). Of course, as described, nonparties like Ecotech and Fair Trade may "be liable for civil contempt notwithstanding their nonparty status" if they are in active concert or participation with Olivet. *Goya Foods*, 290 F.3d at 75. But whether Ecotech qualifies as an affiliate of Olivet, and whether Fair Trade qualifies as a parent of Olivet, are matters that need not be addressed now, before Olivet has even become subject to the permanent injunction. Because the parties agree to an injunction that requires Olivet to provide its parents and affiliates with copies of the order, Ecotech and Fair Trade will be on notice of its terms. ECF 243-1, at 2; *see Auritt v. Auritt*, No. 18-cv-471-DBH, 2021 WL 3856455, at *10 (D. Me. Aug. 30, 2021) (Defendant's "parents should be placed on notice" that they may not "assist [defendant] in activities that would violate this injunction.").

## II.    **Wastebasket Lids.**

Olivet next objects to the proposed injunction's inclusion of its wastebasket lids because, in its view, the jury's verdict in favor of Sterilite on the tortious interference claim does not warrant, and the *eBay* factors do not support, such relief.[66]

---

[66] Olivet also argues that the proposed injunction is overbroad because the Court already found that Sterilite's wastebasket lids are not entitled to trade dress protection. *See* ECF 137, at 40-42. But Sterilite seeks to enjoin the sale of Olivet's wastebasket lids as a remedy for its tortious interference claim, not its trade dress infringement or unfair competition claims. *See* ECF 267, at 1-2. Sterilite previewed that request in the joint pretrial memorandum and its own pretrial memorandum, which argued that it would "show, through evidence introduced during trial and/or post-trial, that it is entitled to a permanent injunction prohibiting Olivet from selling its Knock-Off wastebasket lids or otherwise imitating the Sterilite 13-Gallon Swing Top Wastebasket Lid and Sterilite 11-Gallon Swing Top Wastebasket Lid, and from engaging in further unfair or

Before trial, at the parties' request, the Court clarified that even though it had granted summary judgment to Olivet on Sterilite's trade dress infringement, dilution, and common law unfair competition claims regarding Sterilite's 11- and 13-gallon wastebasket lids, evidence regarding the lids remained relevant to Sterilite's tortious interference claim. ECF 155. Under Massachusetts law, to prevail on a claim for tortious interference with business relations, "a plaintiff must prove that (1) [it] had an advantageous relationship with a third party . . . ; (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *Blackstone*, 448 Mass. at 260. Sterilite contended, and the Court agreed, that evidence concerning the wastebasket lids was relevant to the fourth element of the claim. ECF 155. Sterilite's theory—contested by Olivet—was that it was harmed because had Olivet not offered to sell Walmart the infringing knock-off cabinets and drawers, Walmart would not have agreed to purchase the non-infringing knock-off wastebasket lids. *See id.* In finding Olivet liable for tortious interference, the jury concluded that Olivet's breaking of Sterilite's relationship with Walmart, through the improper means of trade dress infringement with respect to the cabinets and drawers, caused Sterilite the harm of the lost wastebasket lid business. *See* ECF 216, at 3.[67] And to compensate Sterilite for that harm, the jury awarded Sterilite $5.2 million in lost profits on the wastebasket lids. *Id.*

---

deceptive acts or practices to interfere with Sterilite's business relationships." ECF 169, at 4; ECF 187, at 4. The complaint also alleged, in the tortious interference count, that "Sterilite has suffered, and unless Olivet's conduct is enjoined, will continue to suffer, actual damages and irreparable harm, as to which it has no adequate remedy at law." ECF 1, ¶ 76.

[67] The Court instructed the jury on the limited relevance of the evidence on wastebasket lids as follows:

> [Y]ou will hear evidence in this case about Sterilite's 11-gallon and 13-gallon wastebasket lids. That evidence may be admitted for the limited and sole purpose

In seeking to permanently enjoin Olivet from selling the 11- and 13-gallon wastebasket lids to Walmart, Sterilite contends that it is entitled to equitable relief, in addition to damages, to remedy the harm from Olivet's tortious interference. In Sterilite's view, Olivet continues to benefit from its tortious interference by making ongoing sales of the 11- and 13-gallon wastebasket lids to Walmart, and Sterilite conversely continues to be harmed by its loss of market share. Olivet rejects this theory, contending that the jury's damages award adequately compensates Sterilite for Olivet's tortious interference, and that Sterilite experiences no irreparable harm from Olivet's ongoing sales of the wastebasket lids to Walmart.

The Court begins the analysis where the parties agree. There is no dispute that, under Massachusetts law, an injunction is generally permissible to remedy tortious interference. *See* ECF

---

of addressing Sterilite's claim for tortious interference with business relationships. You may not consider this evidence in assessing Sterilite's other claims which assert infringement of the claimed trade dress of Sterilite's 4-shelf cabinets, 2-shelf cabinets, and 4-drawer units. Evidence of Sterilite's wastebasket lids is irrelevant to its infringement claims.

As I will instruct you further at the close of trial, to prevail on its tortious interference with business relationships claim, Sterilite must establish four things: One, that it had a business relationship with Walmart. Two, that Olivet knowingly induced a breaking of that relationship. Three, that Olivet's interference with the relationship, in addition to being intentional, was improper in motive or means. And, four, that Sterilite was harmed by Olivet's actions. Evidence regarding Sterilite's wastebasket lids is relevant only to that fourth element, that is, the harm or damages aspect of the claim. Specifically, you will decide whether Sterilite has shown that its lost wastebasket revenu[e] directly and proximately resulted from Olivet's interference with Sterilite's relationship with Walmart by improper motive or means.

Sterilite's theory is that a reasonable jury could conclude based on the evidence that . . . had Olivet not offered to sell Walmart knockoffs of the drawers and cabinets, Walmart would not have agreed to purchase the knockoff wastebaskets, and instead would have continued to purchase those products from Sterilite.

ECF 219-1, at 31:24-33:6.

256, at 2; ECF 267, at 3. The Supreme Judicial Court has repeatedly approved of injunctive relief as a remedy for a defendant's tortious interference with an advantageous relationship. *See, e.g.*, *Beekman v. Marsters*, 195 Mass. 205, 215 (1907) ("Where the plaintiff proves that the defendant unlawfully interferes with or threatens to interfere with his business or his rights under a contract, and further makes out in proof that damages will not afford an adequate remedy, equity will issue an injunction."); *accord Tompkins v. Sullivan*, 309 Mass. 496, 500-01 (1941) (interference with contract); *Pino v. Trans-Atlantic Marine, Inc.*, 358 Mass. 498, 504-505 (1970) (interference with business relationship). Olivet maintains that, because an injunction "must be grounded in a present showing that future unlawful conduct is probable," the injunction here can reach only the sale of its infringing cabinets and drawers, not its non-infringing wastebasket lids. *Cleary v. Comm'n of Pub. Welfare*, 21 Mass. App. Ct. 140, 150 (1985).[68] But under Massachusetts law, a plaintiff can be granted injunctive relief to protect an advantageous business relationship "from interference by a stranger seeking to cause a [rupture of that relationship] and *to prevent him from enjoying the benefits arising from such*" a rupture. *Comerford v. Meier*, 302 Mass. 398, 404-05 (1939) (emphasis added). Such relief from future interference is appropriate if it does not give the plaintiff "'greater rights'" than he would have had without the defendant's intentional interference. *Pino*, 358 Mass. at 505.

By awarding Sterilite $5.2 million in damages on the tortious interference claim, the jury necessarily found that Olivet's infringement of Sterilite's trade dress in its cabinets and drawers

---

[68] Sterilite does not dispute that, given the Court's prior ruling that Sterilite's wastebasket lids are not entitled to trade dress protection, any entity could copy those lids. *See* ECF 137, at 41. As the First Circuit has explained: "One has a right to ape . . . the unpatented product of another. In the absence of false representations or palming off, the sale of unpatented replacement parts by one other than the manufacturer of the original equipment is neither unlawful nor actionable." *Hypertherm, Inc. v. Precision Prods., Inc.*, 832 F.2d 697, 700 (1st Cir. 1987) (citations omitted).

enabled Olivet to obtain the wastebasket lid business at Walmart. *See* ECF 226, at 124:1-125:7 (instructing jury on damages for this claim). This finding means that Olivet's wastebasket lid revenue "directly and proximately resulted from [its] improper interference" with Walmart. *Id.* at 124:16-18. Enjoining Olivet from selling its knock-off wastebasket lids to Walmart going forward does not afford Sterilite "'greater rights'" than it would have had absent Olivet's tortious interference, *Pino*, 358 Mass. at 505, because that revenue was a "benefi[t] arising from" Olivet's trade dress infringement of Sterilite's cabinets and drawers, *Comerford*, 302 Mass. at 405.

Whether Sterilite again obtains Walmart's wastebasket lid business "in the future may depend upon various factors, but should not be dependent upon [Olivet's] arbitrary" trade dress infringement of Sterilite's cabinets and drawers. *Pino*, 358 Mass. at 505. Since, as the jury found, that infringement caused Sterilite to lose the wastebasket lid revenue from Walmart, an injunction prohibiting further sales of Olivet's copied wastebasket lids is permissible under Massachusetts law. *See id.* at 504-05; *Max-Planck-Gesellschaft Zur Foerderung Der Wissenschaften E.V. v. Whitehead Inst. for Biomedical Rsch.*, 850 F. Supp. 2d 317, 326 (D. Mass. 2011) (denying motion for summary judgment on tortious interference claims because "future particularized economic damages can be adequate for purposes of obtaining equitable relief"); *Corp. Techs., Inc. v. Harnett*, 943 F. Supp. 2d 233, 248 (D. Mass. 2013), *aff'd*, 731 F.3d 6 (1st Cir. 2013) (injunctive relief for tortious interference claim "would be inappropriate in the absence of evidence of some present threat of future harm").

The next question is whether the *eBay* factors support such relief. The first two factors, which "require a substantial injury that is not accurately measurable or adequately compensable by money damages," weigh in favor of a permanent injunction. *Glob. NAPs*, 706 F.3d at 13 (quotation marks omitted). Olivet principally argues that the jury's award of $5.2 million has fully

compensated Sterilite for the lost wastebasket lid revenue. This award, however, compensates Sterilite for only *past* lost revenue, not *future* lost sales. Olivet concedes that "the wastebasket sales were found to be an injury suffered by Sterilite arising from the alleged tortious act of Olivet's sale of cabinets to Walmart." ECF 256, at 15. Where the jury found that Sterilite lost Walmart's wastebasket lid business because Olivet infringed the trade dress of Sterilite's cabinets and drawers, Sterilite has been, and will continue to be, harmed by Olivet's sale of those lids to Walmart. *See Empire Indus. Inc. v. Winslyn Indus., LLC*, 327 F. Supp. 3d 1101, 1109 (N.D. Ill. 2018) (granting injunction to prevent irreparable harm from tortious interference with a contract that had already been terminated because plaintiff could "suffer harm from [defendant's] interference with its contract so long as [defendant] continues to purchase more sinks from [manufacturer]"). The Court is not persuaded by Olivet's position that Sterilite may be entitled to lost profits from the wastebasket lid sales through trial, but is not entitled to any further remedy for those sales after trial. Such an arbitrary remedial line, marked by the happenstance of the trial date, finds no support in precedent. Sterilite has adequately shown that Olivet's ongoing sales of its copied wastebasket lids to Walmart constitutes an irreparable injury for which there is no adequate remedy at law. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) ("[I]njunctive relief is appropriate where it would be 'very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come.'" (quoting *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999)).[69]

---

[69] Olivet moves to supplement the record with evidence showing that Walmart is now selling Sterilite's Model No. 1089 13-gallon wastebaskets. That evidence has little bearing on Sterilite's motion for a permanent injunction. As the parties agreed in the Statement of Undisputed Material Facts submitted at summary judgment, Sterilite's "13-Gallon Lid" at issue in this case—the one that Olivet allegedly copied and that was the subject of each of Sterilite's claims—was Model No.

The third factor, concerning the balance of hardships between Sterilite and Olivet, also favors a permanent injunction. Olivet contends that it "would suffer immense harm if permanently enjoined from selling the non-infringing wastebasket lids since Sterilite does not have any trade dress rights in them" and any other entity "would be able to sell the lids." ECF 256, at 14. But as the jury found, Olivet's sale of those lids to Walmart was the product of its improper trade dress infringement of Sterilite's cabinets and drawers. And "the loss of profits a defendant might suffer

---

1088, not Model No. 1089. ECF 115, ¶¶ 40(e), 41(d). Sterilite's damages expert, Sara Rinke, also prepared a schedule, which was admitted at trial, detailing how Walmart stopped purchasing Model No. 1088 in 2022 but continued to buy Model No. 1089 between September 2021 and December 2024. Trial Ex. 133, at 14, 18; *see* ECF 222, at 36:17 (admitting that schedule into evidence). Rinke similarly testified on cross-examination that "[c]ertain of the wastebaskets were still being sold for a period of time," without specifying the model number. ECF 222, at 79:9-10. During cross-examination, Olivet did not question why Rinke looked to Model No. 1089 in her damages calculations despite Sterilite's continued sales of that product to Walmart between 2021 and 2024, which was the relevant period at trial for damages. Nor did Olivet raise this issue at any time post-trial to dispute her supplemental lost profit calculations. *See* ECF 266-2 (Rinke's post-trial declaration supplementing her lost profit calculations).

Olivet's motion to supplement the record is nonetheless granted because it helpfully clarifies the distinction between Sterilite's Model No. 1088 and Model No. 1089 wastebasket lids. The jury found that Sterilite's loss of business in its sales of Model No. 1088 to Walmart was caused by Olivet's tortious interference with the trade dress in Sterilite's cabinets and drawers. Thus, the permanent injunction can sweep no farther than Olivet's sales of its 13-gallon wastebasket lid that replicates Sterilite Model No. 1088. To the extent Olivet sells Walmart a 13-gallon wastebasket lid that replicates Sterilite Model No. 1089, those sales were not at issue in this case and are not affected by the permanent injunction. *See* ECF 285, at 2 (Sterilite acknowledging that "[t]he 1089 wastebasket [lid] was not, and is not, the 13-gallon wastebasket [lid] that Olivet copied, nor is it the subject of Sterilite's pending motion for permanent injunction").

Relatedly, Sterilite proposes that Olivet be permanently enjoined from using "any substantially similar design" to its current 11- and 13-gallon wastebasket lids. ECF 243-1, at 2. That restriction will be excluded from the permanent injunction because it is not "tailored to the specific circumstances" of this case. *Cok v. Fam. Ct. of Rhode Island*, 985 F.2d 32, 34 (1st Cir. 1993) (per curiam). Since Sterilite's 11- and 13-gallon wastebasket lids, unlike its cabinets and drawers, are not entitled to trade dress protection, Sterilite cannot seek to restrict Olivet's use of "confusingly" or "substantially" similar designs beyond the jury's finding that Olivet's wastebasket lid business at Walmart was the product of Olivet's infringement of Sterilite's trade dress in its cabinets and drawers. ECF 243-1, at 2. Instead, Olivet will be prohibited from selling to Walmart only its current 11- and 13-gallon wastebasket lid designs that were before the jury at trial. *See* ECF 285, at 1-2 (Sterilite representing that Model No. 1088 has a different design from Model No. 1089).

because it has built up its business around infringing another's [trade dress] 'merits little equitable consideration.'" *165 Park Row, Inc. v. JHR Dev., LLC*, No. 12-cv-106-NT, 2014 WL 442554, at *5 (D. Me. Feb. 4, 2014) (quoting *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir. 1988)). The harm to Olivet is also lessened by the fact that it can sell the disputed wastebasket lids to any entity other than Walmart and can continue to sell lids to Walmart if those lids do not use the design of Sterilite's 11-gallon wastebasket lid and Model No. 1088 13-gallon wastebasket lid. ECF 243-1, at 2; *see Empire Indus.*, 327 F. Supp. 3d at 1117-18 (balance of hardships supported preliminary injunction that "would only bar [defendant] from buying sinks that run afoul of [manufacturer's] exclusivity agreement with [plaintiff]" where defendant "effectively brought upon itself any hardship" and could "'copy the [plaintiff's] product'—just not through" that manufacturer). Accordingly, Sterilite's future lost profits from the wastebasket lid business at Walmart outweighs Olivet's harm.

The final factor similarly supports Sterilite because "the public interest would not be disserved by a permanent injunction." *eBay Inc.*, 547 U.S. at 391. Olivet maintains that the public interest is best served through competition and that "[t]here is absolutely nothing legally or morally reprehensible about exact copying of things in the public domain." McCarthy § 23:122. While Sterilite's wastebasket lids are not entitled to trade dress protection, the jury determined that Olivet received the lid business from Walmart by infringing the trade dress of Sterilite's cabinets and drawers. The Court agrees with Sterilite that permitting Olivet to reap the benefits of its trade dress infringement would undercut "commercial morality." ECF 267, at 8; *see Contour Design, Inc. v. Chance Mold Steel Co.*, No. 09-cv-451-JL, 2010 WL 174315, at *4 (D.N.H. Jan. 14, 2010) ("The public interest likewise favors the issuance of an injunction against the misappropriation of trade secrets to 'reinforce the public policy of commercial morality.'" (quoting *Gen. Elec. Co. v. Sung*,

843 F. Supp. 776, 778 (D. Mass. 1994)). The injunction, which will prohibit Olivet from using its lid designs that replicate Sterilite's 11-gallon wastebasket lid and Model No. 1088 13-gallon wastebasket lid, is therefore properly "tailored to the specific harm to be prevented." *Ross-Simons*, 217 F.3d at 14.

III.    **Sam's Club.**

Olivet further objects to the proposed injunction's restriction of wastebasket lid sales to Sam's Club in addition to Walmart. ECF 243-1, at 2. At the July 31, 2025 motion hearing, the Court asked whether any evidence was admitted at trial concerning sales to Sam's Club or showing a corporate relationship between Walmart and Sam's Club. ECF 269, at 53:6-54:9. In response, Sterilite points, in part, to Olivet's interrogatories requesting the sales data for Sterilite's products "with Walmart, including but not limited to sales made in store, online through Walmart.com, or via Sam's Club." ECF 105-3, at 10. This evidence was not, however, presented at trial and fails to establish a connection between the two entities. Sterilite also highlights Overbey's testimony that her "focus is selling more product to Walmart and Sam's Club." ECF 222, at 135:21-23; *see* ECF 220, at 71:22-24 (similar). This testimony indicates that these entities are distinct. Nor can Sterilite rely on a sales summary prepared by its damages expert, Sara Rinke, that has tables listing "Sams Club Int'l" under columns for Walmart's sales and revenue. *See* Trial Ex. 133. This summary is likewise insufficient to establish a connection between those two entities and, in fact, shows that Sterilite did not sell its wastebaskets to Sam's Club between 2018 and 2024. *See id.* at 4-7, 14-19. Olivet is correct that the trial evidence concerned the parties' sales to Walmart, not Sam's Club,

and thus does not support an injunction relating to Sam's Club. The injunction will, accordingly, exclude Sam's Club.[70]

## CONCLUSIONS AND ORDERS

For the foregoing reasons, Sterilite is entitled to judgment on its dilution claim under M.G.L. c. 110H, § 13 because it proved by a preponderance of the evidence at trial that Olivet diluted the value of its trade dress in its cabinets and drawers. In addition, Olivet's motion to supplement the record, ECF 276, is GRANTED, and Sterilite's motion for a permanent injunction, ECF 243, is GRANTED in part and DENIED in part. A separate order will issue memorializing the permanent injunction entered by the Court.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
Dated: December 2, 2025                           UNITED STATES DISTRICT JUDGE

---

[70] To the extent that Sam's Club is, as Sterilite contends, a division of Walmart, the injunction's prohibition of sales of Olivet's current wastebasket lids to Walmart would cover Sam's Club. ECF 272, at 4 n.4.